IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
CIVIL ACTION NO:

| | | |
|---|---|---|
| **ANGELICA ROSE BROWN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **COMPLAINT FOR DAMAGES** |
| **v.** | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| **THE UNIVERSITY OF NORTH** | ) | |
| **CAROLINA at CHAPEL HILL;** | ) | |
| **SHIMUL MELWANI (in her individual** | ) | |
| **capacity); SREEDHARI DESAI (in her** | ) | |
| **individual capacity); MICHAEL** | ) | |
| **CHRISTIAN (in his individual capacity);** | ) | |
| **BOARD OF GOVERNORS OF THE** | ) | |
| **UNIVERSITY OF NORTH CAROLINA** | ) | |
| | ) | |
| **Defendants.** | ) | |

## COMPLAINT FOR DAMAGES

**NOW COMES** Angelica Rose Brown ("Plaintiff" or "Ms. Brown"), by and through undersigned counsel, to file this Complaint against the University of North Carolina at Chapel Hill ("UNC"); Shimul Melwani ("Melwani") ; Sreedhari Desai ("Desai"); and Michael Christian ("Christian") (collectively "Individual Defendants"); and in support thereof states as follows:

## INTRODUCTION

1.      Angelica Rose Brown is an African-American woman with a track record of personal and academic success.  In 2020, she enrolled in the Ph.D. Organizational Behavior Program (the "**Ph.D. Program**") at UNC's prestigious Kenan-Flagler Business School ("**KFBS**" or "**Kenan-Flagler**"), expecting that UNC would meet its reputation for matching excellence with inclusion. Instead, from her early days at UNC, Ms. Brown was subjected to a double standard motivated by a combination of her race and gender and when she had the audacity to complain, Defendants aggressively wrecked her professional standing.

2.      The University of North Carolina at Chapel Hill is a public research university in Chapel Hill, North Carolina. The flagship of the University of North Carolina system, it is considered a Public Ivy, or a public institution which offers an academic experience similar to that of an Ivy League university.

3.      KFBS's organizational behavior program rigorously studies the following:

"team dynamics, decision-making, motivation, power and influence, employee well-being, creativity, performance management and organizational chance." Ms. Brown's primary research focus was the manner in which organizations marginalize African-Americans and routinize stigmatizing perceptions of black people in the workforce. Ironically, she found herself subjected to the same insidious racial dynamic that is at the heart of her research.

4.      One year into a five-year program, Ms. Brown was abruptly informed that she had no future at KFBS and would be terminated from the Ph.D. Program, consigned to a Masters' Degree instead of a doctorate. Yet, she was told that her academic standing and research performance met the program's standards, as her grades confirmed: the vague reasons cited for UNC's dissatisfaction with Ms. Brown are a thinly veiled veneer for entrenched stereotypes about individuals who are Black and Female.

5.      As this Complaint alleges below, the unequal treatment meted out to Ms. Brown took on various forms, some of them deeply personal. Ms. Brown is a survivor of post-traumatic stress disorder ("PTSD"), a condition which is documented in her enrollment file. In her first months at UNC, she disclosed to Defendants Desai, Christian and Melwani that she encountered sexual violence from a male acquaintance that retriggered her trauma. For reasons related to this personal crisis, she requested limited and infrequent delays in course deadlines.

6.      While these extensions were granted, Defendants later pretextually alleged a pattern of extensions as a performance issue during her academic review process. The Ph.D. Program has a settled practice of permitting both white and male students long extensions and scheduling accommodations for reasons ranging from personal crises to writer's block with no penalty or consequence.

7.      During her year in the Ph.D. Program, Ms. Brown was denied the usual latitude in research direction extended to non-African American students: at one point, she was directed to shift the subject of a journal article to examine intra-racial conflicts in the African American community, a negative narrative to which she was unwilling to contribute. Later, Ms. Brown was directed to administer a field survey that paid Black research participants one-tenth the compensation rate UNC ordinarily paid for participation in such surveys. When Ms. Brown reported the disparity, Defendant Desai belittled her competence and her suitability for the Ph.D. Program, at one telling Ms. Brown "you are not as competent as *we* thought you were", and questioning her about her four years old scores on the Graduate Record Examination ("GRE.")

8.      Defendants retaliated against Ms. Brown because in June 2021 she reported their discriminatory pattern of conduct to KFBS' Diversity and Inclusion Program and its Equal Opportunity Compliance Office ("EOC"): first, by terminating her contract as a Ph.D. participant; then by disseminating negative information to institutions to which she subsequently applied. Their retaliation caused Ms. Brown to experience emotional anguish, and the trauma forced her into additional therapy and treatment.

9.      Despite Defendants' efforts to derail and disparage Ms. Brown, Ms. Brown's research was of a quality that it has been accepted into prestigious academic management symposia.

2

10.     Ms. Brown brings this cause of action to recover damages under federal and North Carolina law for the mental anguish, severe emotional distress, financial loss, and pain and suffering she has endured.

## JURISDICTION AND VENUE

11.     This action alleges race discrimination and retaliation in violation of 42 U.S.C.A §§ 1981 and 1983, and Title VII and Title VI of the Civil Rights Act of 1964, as amended, 42 U.S.C.A. §§ 2000e *et seq*; and the Rehabilitation Act of 1973, 29 U.S.C.A. §§ 701 *et. seq*.

12.     This Court has federal question jurisdiction over these claims under 28 U.S.C. § 1331, and over the alleged state law claims under supplemental jurisdiction as defined in 28 U.S.C. § 1367. These state law claims are based on a common nucleus of operative facts as the underlying federal claims. Defendants' intentionally unlawful, discriminatory, and tortious conduct complained of herein occurred in this district.

## PARTIES

13.     Plaintiff **ANGELICA ROSE BROWN ("Ms. Brown")** is an African-American female and a citizen of the State of North Carolina. Plaintiff was a Ph.D. student in the Organizational Behavior Department in the Kenan-Flagler Business School at UNC from 2020-2021.

14.     Defendant **UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL ("UNC")**, is a tax-exempt non-profit state institution and research university with a workforce of 13,500 employees. UNC is one of the universities of the North Carolina System, operating in Orange County, North Carolina. UNC is a North Carolina body politic created by the General Assembly of North Carolina pursuant to N.C. Gen. Stat. § 116-3.

15.     Defendant **BOARD OF GOVERNORS OF THE UNIVERSITY OF NORTH CAROLINA (UNC BOG)** is the policy making body legally charged with the general determination, control, supervision, management, and governance of all affairs of the 17 constituent institutions.

16.     Defendant **Melwani** is a citizen of the State of North Carolina and was acting under color of state law in her capacity as Assistant Professor of Organizational Behavior at UNC. At all times relevant to this complaint, Melwani was an Associate Dean and the program coordinator of Ms. Brown's behavioral science Ph.D. Program, and was the Ph.D. Coordinator in charge of student reviews, including Ms. Brown's annual review.

17.     Melwani's actions are imputed to UNC pursuant to *respondeat superior*. Melwani is also independently liable for certain actions alleged herein in her individual capacity. Defendant Melwani is an Indian-American female.

18.     Defendant **DESAI** is a citizen of the State of North Carolina and was acting under color of state in her capacity as Assistant Professor of Organizational Behavior at UNC. At times relevant to this complaint, Desai was one of Ms. Brown's principal academic

3

advisors.

19.     Desai's actions are imputed to UNC pursuant to *respondeat superior*. Desai is also independently liable for actions alleged herein in her individual capacity. She is an Indian-American female.

20.     Defendant **CHRISTIAN** is a citizen of the State of North Carolina and was acting under color of state law in his capacity as Professor of Organizational Behavior at UNC. At times relevant to this complaint, Christian was one of Ms. Brown's principal academic advisors. He also was one of the writers of her annual review and was a decision-maker in her termination from the Ph.D. Program.

21.     Defendant Christian's actions are imputed to UNC pursuant to *respondeat superior*. Christian is also independently liable for actions alleged herein in his individual capacity. He is a white male.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

22.     On March 30, 2022, Ms. Brown filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") asserting that she had been discriminated against by UNC because of her race, gender and disability.

23.     The EEOC issued a Right to Sue Letter on June 5, 2022. *See* attachment A.

24.     All administrative remedies have been satisfied prior to filing this action.

## BACKGROUND FACTS

### Ms. Brown's History

25.     Ms. Brown is a first-generation college graduate, beauty pageant winner, and North Carolina native who worked her way through higher-education institutions while maintaining exemplary grade-point averages and engaging in various community service initiatives.

26.     Prior to enrolling at UNC, Ms. Brown held a Master of Science Degree in Nonprofit Leadership obtained in 2019 from the University of Pennsylvania ("UPenn"). She holds a Bachelor of Science Degree in Business Administration and a Bachelor of Science in Psychology from the University of North Carolina at Charlotte ("UNCC"). Ms. Brown is also a former Miss Piedmont as well as a winner of Pure International pageants as Miss North Carolina 2018 and Miss Pennsylvania 2019.

27.     Ms. Brown has taken on leadership, teaching, and mentorship responsibilities in every academic program in which she has been involved. Ms. Brown taught two courses as an adjunct professor at William Peace University in Raleigh, NC. She has served as the Kenan-Flagler DEI Liaison, as a member of the Organizational Behavior DEI Committee, and as the Organizational Behavior Department Ethical Leadership Teaching Assistant. She previously participated in the University of Pennsylvania's Student Government as the Non-profit Leadership Representative.

28.     Ms. Brown has been an advocate for sexual violence survivors like herself through engagements with the Mecklenburg County Domestic Violence Speaker's Bureau and

the National Coalition Against Domestic Violence Speaker's Bureau. She is a former volunteer for the Orange County Rape Crisis Center.

29.     Ms. Brown founded the organization Feeding the Heart and Soul of America, nonprofit initiative that aid the homeless and organize birthdays for underprivileged children.

30.     At KFBS, Ms. Brown performed the following primary research projects during her 2020-2021 year:

a. Fall 2020: focus on the behavior of code-switching by African-Americans in the workplace, supervised by Melwani and Christian;

b. Spring 2021: focus on code-switching by African-Americans in the workplace, supervised by Desai;

c. Spring 2021: focus on Colorism, intra-ethnic discrimination based on shades of color and skin tone, supervised by Desai;

d. Spring 2021: The impacts of motherhood on the professional standing of women of color, supervised by Desai.

## UNC

31.     UNC is the crown jewel of the North Carolina University System. It maintains the highest standards for admission of the North Carolina state universities and is one of the most highly regarded public educational institutions in the country, currently ranked by US News as Number 5 in its list of top public schools and Number 28 among all national universities.

32.     In addition to its reputation for academic excellence, UNC boasts of a culture of diversity and inclusion, and sponsors various organizations to promote the ideal of equitable treatment.

33.     There are cracks in UNC's image of inclusion. Close in time to the events alleged in this complaint, UNC faced a national controversy over its denial of tenure to Nikole Hannah-Jones, a Pulitzer Prize winning journalist and academic and a Black woman, whose groundbreaking 1619 Project has demonstrated the centrality of slavery and its consequences to American history.

34.     In the summer of 2020, just prior to Ms. Brown's enrollment, a group of UNC undergraduates identifying themselves as "P&N (Psychology and Neuroscience) Students of Color" signed an open letter to UNC entitled *Dear White People,* which demanded action to eliminate vestiges of racism and discrimination within their psychology department. They

alleged that the number of Black students in the undergrad psychology program was steadily declining and that the faculty was monolithically White. "This department lacks diversity," it says. "Scrolling through our Department's web page tells us that **91% of faculty are white, or white passing, while only 60% of Americans identify as non-hispanic white.**" (Emphasis in original)

35.     Various other racial controversies at UNC have been a recent point of contention. https://www.nytimes.com/2022/04/28/us/unc-report-gop.html

## Organization of the Ph.D. Program at UNC

36.     UNC created the Kenan-Flagler Business School in 1919.  Its diversity statement indicates that it is "the first Southern institution and sixth overall to join the Consortium for Graduate Study in Management, a cooperative network of universities established to give African-Americans, women, Hispanic Americans and Native Americans the business skills they need to secure positions in U.S. corporations." The Doctoral program has six areas of concentration:

   a.  Accounting,

   b.  Finance and Real Estate,

   c.  Marketing,

   d.  Corporate Data Management,

   e.  Organizational Behavior, and

   f.  Strategy and Entrepreneurship.

37.     This litigation centers on the Organizational Behavior Program, which "stud[ies] how people act and interact within groups. Using research drawn from the disciplines of psychology, sociology, social psychology, economics, anthropology and political sciences, . . . [to] use a scientific approach to better understand and manage a workforce."

38.     Below is the organizational structure of the Ph.D. Program at Kenan-Flagler at times relevant to this complaint:

6



38.    The Ph.D program at the times relevant to this complaint was chaired by William Maddox. The Associate Dean for Academic Affairs in the same time frame was Dr. David Hoffman, who upon information and belief expressed the view in the fall of 2021 that Ms. Brown had been put through "Hell" at KFBS.

## Ms. Brown Enrolls and Accepts Position at UNC

39.    On March 23, 2020, UNC accepted Ms. Brown into its Ph.D. Organizational Behavioral Program at Kenan-Flagler and her enrollment began on August 1, 2020. She was the only black female in KFBS' Ph.D. program in the 2020-21 academic year.

40.    As part of her participation in the Ph.D. Program, Ms. Brown was required to undertake employment as a Graduate Research Assistant ("GRA") at Kenan-Flagler.  UNC sent the following email describing her status as an employment relationship:

> As the Kenan-Flagler Business School Student Employment Manager, I am contacting you regarding your Fiscal Year 2020-2021 Graduate Research Assistantship. Please review the information below, as well as the instructions for forms that you will need to complete and submit to Human Resources in order to commence employment.

41.    Subsequently, UNC emailed Ms. Brown to confirm her employment, stating that "Your hiring action for employment within the Kenan Flagler Business School has been completed. Your position details are below:.............................................."

42.    As a GRA, Ms. Brown was directed to complete the following documents that are indicia of employment:

a.  An I-9 Form;

b. W-2 tax statements that list employer's name as "UNC Chapel Hill", provide

an employer EIN, Wages, federal and state income tax withheld;

c. Health insurance election documents; and

d. Paycheck deduction forms.

43. The paychecks Ms. Brown received from UNC beginning in August 2020 list Ms. Brown as a GRA, while her employer is listed as "University of North Carolina at Chapel Hill", with Keenan-Flagler described as her department and location.

44. UNC defines a GRA as "[a] graduate student, enrolled as a full-time student, and engaged in research activities directly related to their program of study under the supervision or in collaboration with a member of the graduate faculty." UNC offered Ms. Brown compensation at a rate of $33,333.36 in August 2020, which eventually increased to a rate of $34,444.44 by May 2022.

### Early Signs of Marginalization

45. In a sign of things to come, in the summer of 2020 KFBS sent a troubling signal as to how Ms. Brown was perceived—even before she officially enrolled—with this email from Christian: "Hi all [the Ph.D. Program advisors and students], read this article and thought I'd pass it on, <u>especially for Rose</u>......................................................................... " (emphasis added). The article is entitled *Modest Advice for Graduate Students* and is described as a guide to survive "imposter syndrome" at a graduate school. Christian's group email singled Ms. Brown out to her colleagues and faculty and portrayed her as a student in unique need of advice about overcoming a sense of "not belonging"--an offensive gesture that diminished her in front of her White colleagues.

46. KFBS then failed to include a photo of Ms. Brown, its only Black Female Ph.D. Program candidate, in their portfolio of candidates.

47. UNC knew or should have known that these actions would marginalize Ms. Brown among her colleagues.

### Ms. Brown's PTSD and Subsequent Trauma

48. Ms. Brown has previously been diagnosed with Post-Traumatic Stress Disorder ("PTSD"), and registered her disability at each higher education institution she has attended prior to UNC. She has openly disclosed her diagnosis in published articles that have identified her as a "beacon of hope. " <u>https://www.shelbystar.com/story/news/2018/04/08/kings-mountain-woman-talks-of-</u> <u>overcoming-adversity/12790703007/.</u>

49. Ms. Brown registered her disability to UNC Accessibility Resources and Services ("ARS") prior to the start of classes. Because UNC did not have proper documentation to register disability status, Ms. Brown provided Disability Services her prior documentations of disability as registered with UNCC and UPenn.

8

50.     On August 9, 2020, Ms. Brown was sexually assaulted and raped by a male acquaintance.

51.     In mid August 2020, Ms. Brown shared with Desai, one of her academic advisors, that she had been raped.

52.     In mid August 2020, Ms. Brown discussed with Christian, her initial primary academic advisor, that she anticipated needing periodic scheduling accommodations including potential extensions on research projects due to the legal and emotional aftermath of her assault and rape. In the course of these conversations, Ms. Brown directly told Christian of her preexisting condition of PTSD.

53.     On September 22, 2020, Ms. Brown was raped a second time by the same male acquaintance.

54.     On September 28, 2020, Ms. Brown disclosed to Christian and the program coordinator for her department, Melwani, that she filed a motion for a Domestic Violence Protection Order ("DVPO"). As of September 2020, Melwani, Christian and Desai were all aware that Ms. Brown was a sexual assault survivor, and that her PTSD had been exacerbated by sexual violence.

55.     On one occasion in late October 2020, Ms. Brown was unable to attend a non-mandatory seminar as she was preparing to attend a court hearing regarding her request for a protective order. She made clear to Melwani and Christian the reason she was unable to attend. Rather than acting empathetically, both Melwani and Christian admonished her for not attending the seminar, one of them stating that Ms. Brown was being "disrespectful" for failing to attend an event they had taken time to organize.

**An Ongoing Pattern of Discriminatory Actions (Defendants Melwani and Christian)**

56.     On October 2, 2020, Ms. Brown was invited by Melwani to author a journal article on Ms. Brown's core area of research: the phenomenon of African-Americans engaging in what is referred to as code-switching, the variation of speech styles or interactive behavior in settings with persons of other races or ethnicities. Ms. Brown was assigned to work in conjunction with her primary advisor Christian with Melwani offering collaboration as well.

57.     Later in October 2020, Melwani and Christian directed Ms. Brown to shift the article's focus to Black-on-Black peer pressure in the workplace. Ms. Brown made it clear that she viewed the new proposed topic as a misplaced and inaccurate focus on intra-racial conflict as opposed to her preferred emphasis on the subversive effects of the misplaced power dynamic between whites and blacks in the professional world.

58.     Ms. Brown was condescendingly told by Melwani and Christian that she failed to grasp the foundations of research and that she lacked the expertise to evaluate the appropriate focus for an academic journal. This is the same time frame in which Melwani and Christian also reproached Ms. Brown for failing to attend a non-mandatory seminar in order to

9

prepare to attend her hearing on a protective order.

59.     On November 4, 2020, Ms. Brown decided to withdraw from the code-switching journal project.  She sent Melwani and Christian an email outlining her concern that their preferred approach to the subject matter of the article was inconsistent with her own research objectives and that she did not wish to align her professional brand with a narrative that she felt was at odds with the realities of the African-American experience and would be embraced by forces hostile to that experience.

60.     Later in November 2020, Ms. Brown participated in a social psychology session with Melwani regarding the vision of the Organizational Behavioral Program.  During the session, Melwani was asked what advice she would offer Ms. Brown, to which she answered that the department was small, that "we all talk to each other", and that key figures in the program should never be alienated. Ms. Brown took this commentary as an implied threat to her academic future, given her recent disagreement with Melwani and Melwani's power within KFBS and the organizational behavior Ph.D community.

61.     In the final months of 2020, Ms. Brown prepared to ramp up her own research plan in anticipation of a Spring 2021 code-switching project under Christian's guidance. The ordinary protocol for a primary research mission is that Ph.D. students recruit partners in or outside their institution to join their research team.

62.     Ms. Brown was not afforded the same prerogative. Instead, Christian sought to enlist a *doctoral candidate* who had no prior engagement or familiarity with the targeted area of research. When Ms. Brown questioned the suitability of this individual, Defendant Christian told her "we need someone Black" regardless of credentials.

63.     Ms. Brown countered by proposing an African-American *professor* and faculty member at Howard University who had an extensive background in the subject of code-switching. Defendant Christian rebuffed her proposal, stating he could never sanction an academic from Howard joining a research project without obtaining direct approval from the Chair of the department. Ms. Brown was stunned at this blatantly derogatory viewpoint regarding one of America's premier Historically Black Institutions that is globally recognized for its prowess in social and behavioral sciences.

64.     On December 9, 2020, Ms. Brown received her grades for her first semester. In Christian's introductory class, BUSI 851, she received a grade of "Pass." The other members of her class received a grade of "High Pass."

65.     When Ms. Brown spoke to her upper level peers in KFBS, they conveyed to her that it was extremely rare for a student to receive anything other than a High Pass in Christian's introductory class.  Prior to issuing the grade, which reflects an accumulation of work over the semester, Christian had expressed no concerns over the quality of Ms. Brown's work.

66.     In January of 2021, Defendant Christian informed Ms. Brown that their relationship had become too "damaged" to continue advising her on the code-switching project, principally because of their disagreements over the composition of the research team.

**An Ongoing Pattern of Discriminatory Actions by Defendant Desai**

67.     In February 2021, Desai became Ms. Brown's primary advisor on the code-switching project.

68.     In late 2020, Ms. Brown had begun communicating with a Black professor, Sekou Bermiss ("Dr. Bermiss"), at the University of Texas. Dr. Bermiss had organized an informal network to nurture and mentor Black Ph.D. students in the organizational behavior field. Ms. Brown's engagement with Dr. Bermiss is exactly the kind of mentoring interaction that is considered critical to building a future as an academic. Upon information and belief, Dr. Bermiss commented to faculty members in Ms. Brown's department in the late winter or early spring of 2021 that Ms. Brown had entered his network.

69.     Beginning in March 2021, Ms. Brown was increasingly subjected to adverse scrutiny and interference.

70.     On March 6, 2021, Ms. Brown signed a letter, along with eleven (11) of the twelve (12) Ph.D. candidates in her program, which expressed a desire for UNC to engage with anti-racism movements more deeply and to integrate equity-based insights more deeply into its research priorities. Ms. Brown was the only African-American female that signed the letter.

71.     Signing the letter put another target on Ms. Brown. Almost immediately after the document's issuance, Desai inquired of Ms. Brown about her contacts with Dr. Bermiss, asking if she was seeking him out because "he is Black", and warned her against disparaging the program to people outside of it. She also asked Ms. Brown to provide her GRE scores, which were four (4) years old and irrelevant to her performance at KFBS. Ms. Brown was stunned by these exchanges with Desai.

72.     Desai and Ms. Brown had been partnering on the motherhood project, a study of the uniquely adverse impacts of motherhood on the professional standing of women of color.

73.     In the latter part of March 2021, Desai instructed Ms. Brown to stop participating in the motherhood project as well as the colorism project, the phenomenon of ethnic minorities favoring lighter skinned persons within their race. In the culture of most Ph.D. programs, building a combination of specialties is

viewed as essential to growth, which Desai would have fully understood. Desai told Ms. Brown to focus exclusively on her code-switching project.

74.     In May of 2021, Ms. Brown began to raise concerns about Desai's administration of one of her research surveys for her code-switching project. Such guided surveys are a frequent tool in organizational behavior research. The project as envisioned consisted of a cohort of three-hundred (300) black research participants, who would be compensated for their roles. Ms. Brown soon realized that Desai had directed that these respondents were being paid at a rate that translated into one cent a minute, roughly a tenth of the typical minimum rate paid for subject surveys of $1.50-2.00 per fifteen minutes.

75.     Ms. Brown expressed her view to Desai that the formula was an unethically low level of compensation. Desai claimed that they had to operate within the

constraints of a $45.00 budget.

76.     Ms. Brown suggested that they apply for the Wharton 2021 Diversity and Inclusion grant in order to fund their code-switching project, but Desai instead applied for funding from that source for the very motherhood project she directed Ms. Brown to abandon.

77.     When she learned that her budget for her research was $45.00, Ms. Brown inquired within the department about potential funding sources and specifically reached out to Melwani.  Ms. Brown expressed that KFBS had not properly allowed her a budget to conduct adequate research to support her research initiatives and requirements. Ms. Brown offered to pay for the research herself, but was informed that funding must be derived from a professor's budget. Melwani's response left Ms. Brown without an adequate means to complete research.

78.     Desai exploded at Ms. Brown that she had overstepped her boundaries, which escalated into Desai telling Ms. Brown in a phone call that Ms. Brown was "not as competent as *we* thought" and that Ms. Brown's pre-admission research was not of the quality the Ph.D. program normally expected.

79.     On June 1, 2021, Ms. Brown felt she had no choice but to request that the incoming Ph.D. program coordinator, Dr. Matthew Pearsall ("Pearsall") assign her to another advisor.

80.     On or about June 2, 2021, Pearsall informed Desai of Ms. Brown's request.

81.     Desai, Melwani, and Christian meet on or about June 2, 2021 to strategize about removing Ms. Brown from the PH.D. program.

**Defendants Retaliate Against Ms. Brown for Raising
Internal Complaints of Discrimination.**

82.     After her  request to be assigned a new advisor, Ms. Brown made several overtures to UNC entities to report and redress the discrimination she had been subjected to within the Ph.D. Program.

83.     On June 5, 2021, Ms. Brown met with Sherry. Wallace, the Executive Director of Kenan-Flagler's Engagement and Inclusion program, to report what she believed to be a pattern of discriminatory behavior within her program. She informed Ms. Wallace of her intent to file a charge with UNC's Equal Opportunity Compliance office ("EOC").

84.     On June 8, 2021, Ms. Wallace met with Defendants Christian, Melwani and Desai, who claimed that Ms. Brown had become a source of difficulty and that they needed "advice" on how to deal with her.  Ms. Wallace informed Ms. Brown of the meeting later that day. Ms. Brown reiterated to Ms. Wallace her intent to a complaint with the school's EOC.

85.     Also on June 8, 2021, Professor Angelica Leigh at Duke University ("Duke"), an African-American woman, called Ms. Brown to inform her that she had learned from Christian and Melwani that Ms. Brown was causing "problems" at UNC. Angelica Leigh warned Ms.

Brown that her career was at risk.

86. Ms. Brown met with Pearsall on June 12, 2021, to further discuss her lack of support in the Ph.D. Program. Pearsall in turn stunned Ms. Brown by commenting that her job and education at FBS were in jeopardy. Pearsall stated to Ms. Brown that her real concern should be that she had alienated faculty and that while there is "no issue with your grades and work", the view had emerged that she was "no longer a good fit for the program."

87. On June 18, 2021, Ms. Brown lodged an official complaint of discrimination with the EOC office at UNC and was interviewed by investigators.

88. On July 15, 2021, Ms. Brown spoke with Ms. Wallace about the status of the EOC process. Ms. Wallace told Ms. Brown that she had informed David Hoffman, a senior associate dean at Flagler-Keenan about Ms. Brown's concerns about discrimination in the department. During 2022, Ms. Wallace told Ms. Brown that "If I had known how f***** up this would get, that I would never have said anything."

89. On July 30, 2021, Ms. Brown met with Christian and Pearsall to receive her annual review. Pearsall acknowledged that Defendants Christian, Desai and Melwani were the sources of the review, as Pearsall had no functional involvement with Ms. Brown. They evaluated her in three areas: Classwork, Research, Faculty and Student Interactions. The review was a study in contradictions and untruths.

90. **Classwork**: For the first time in her enrollment, Ms. Brown was told that multiple professors had complained that she had frequently obtained extensions on deadlines.

91. As was acknowledged during the review session, the Organizational Behavior Department has a settled practice of permitting both White and Male students extensions and scheduling accommodations for reasons ranging from personal crises to writer's block with no penalty or consequence. Furthermore, Ms. Browns' extensions were modest in scope, in the range of hours or a few days.

92. Dr. Pearsall stated that that she was not making adequate progress academically. Her grades, however, in 2020-21 were as follows:

| 2020, FALL | | | | |
|---|---|---|---|---|
| Course | Description | Attempted | Earned | Grade |
| BUSI 851 | IND BEHAV/ORG | 3.000 | 3.000 | P |
| BUSI 899 | SEMINAR | 1.500 | 1.500 | H |
| | | | | |
| PSYC 830 | STAT METH PSYC 1 | 4.000 | 4.000 | P |
| PSYC 860 | RES SEM SOCIAL | 3.000 | 3.000 | H |
| | | | | |
| 2021, SPRING | | | | |
| Course | Description | Attempted | Earned | Grade |
| BUSI 808 | APPLD RES METHODS 1 | 3.000 | 3.000 | P |
| BUSI 852 | PERS/GROUP BEH/ORG | 3.000 | 3.000 | H |

| BUSI 899 | SEMINAR | 1.500 | 1.500 | H |
| EDUC 784 | INTERMEDIATE STAT METHODS | 3.000 | 3.000 | P |

93.     The student handbook's prerequisite for continued enrollment requires that students pass their required courses, which Ms. Brown had done, achieving high pass grades in half her courses under what is considered a high classwork load.

94.     **Research**: When Ms. Brown pointed to her academic record, Pearsall repeated his refrain from six weeks earlier that there were "no issues" with her work or research but framed the issue as one of output, saying that she had discontinued projects she had initially launched. But it was Desai who directed Ms. Brown to shelve two projects in which she had been fully engaged. Pearsall and Christian did not at any point identify the metrics of project engagement or completion for a Ph.D. student, or explain what research expectations were during the first year.

95.     Ms. Brown would leave the Ph.D program with two outstanding projects, one on the development and validation of a code-switching scale, the other on how ostracism toward blacks in the workplace impacts code-switching behaviors. Both of these projects are to be presented in August 2022 at the 2022 Academy of Management conference.

96.     **Faculty and Student Interactions:** Pearsall and Christian further stated that Ms. Brown had "burned bridges with faculty" to the point that it was unlikely she could form a dissertation committee to satisfy her doctorate requirements: such a committee was at least three years in Ms. Brown's future. In fact, several new professors had begun to build relationships with Ms. Brown that could have been foundations for her dissertation committee.

97.     Christian weighed in that he viewed Ms. Brown as a source of "damage" and made the comment that "you are hurting people who are my friends and not just colleagues." This remark creates an inference that the Individual Defendants had become well aware of Ms. Brown's complaints alleging discrimination on their part.

98.     Ultimately, Pearsall and Christian informed Ms. Brown that she did not have a path forward in the Ph.D. Program and could transfer to another program or exit with a Masters' Degree in May of 2022.

### The EOC's Inadequate Investigation

99.     Ms. Brown filed her EOC complaint on June 17, 2021, and provided Ms. Wallace a summation of the discriminatory conduct she encountered at UNC.

100.     Ms. Brown was subsequently informed that UNC would conduct and conclude its investigation by November 19, 2021.

101.     Defendants received actual notice of Ms. Brown's EOC complaint on August

14

24, 2021.

102.    The EOC process at UNC dragged on, plagued by delays.  Important pieces of evidence were unexamined, including Ms. Brown's written annual review, which was evidently not finalized until December 21, 2021. This hampered Ms. Brown's ability to document the differences between her review and objective aspects of her work, or to capture particular contradictions that surfaced during the July 30 meeting.

103.    Ultimately, the EOC conducted a flawed investigation. They adopted the factual representations of faculty members over Ms. Brown's versions of events and ignored reasonable inferences concerning patterns of communication among staff. Most troublingly, they appear to have ignored the initial focus of Ms. Brown's complaints of racial insensitivity and discriminatory conduct in favor of a narrow inquiry into whether the review process was influenced by knowledge of the EOC investigation.

**Continuing Internal Retaliatory Conduct**

104.    Even though Defendants communicated their decision to remove Ms. Brown from the Ph.D. Program on July 30, 2021, Ms. Brown remained a student within the Organizational Behavior Program, although in a non-terminal Master's capacity, until May 2022.

105.    In her efforts to remain in good standing and rebuild, she solicited and procured an advisor, Dr. Jeff Edwards. She also continued to conduct research and apply for grants, but was not supported. One grant for which she applied was the Kenan Institute's Small Research Grant Program, which funds projects that provide insights into technology, innovation, and strategy and topics related to diversity, equity, and inclusion.  After the July 30 Meeting, Ms. Brown asked for details about the grant, but Pearsall informed her (inaccurately) that she was not eligible and would not provide her a letter of recommendation.

106.    On November 22, 2021, in order to discuss the lack of support in securing research grant funds, Ms. Brown met with Dean Hoffman, who was aware that she had been "put through hell" by the faculty, and that she had been pushed out of the Ph.D. Program. Hoffman has known about the mistreatment since on or about July 15, 2021.

107.    As Ms. Brown continued to challenge her termination from the Ph.D. program, UNC by way of the department head Dr. Maddux reiterated that Ms. Brown would not be permitted to remain in the Ph.D. Program, this time citing as grounds the likelihood that she could not assemble a dissertation committee in three and a half years.  Ironically, Ms. Brown was accepted in the final months of 2021 into the Southern Management Association Early Stage Doctoral Consortium.

108.    In December 2021, Dr. Barbara Nobles Crawford ("Dr. Crawford"), the only Black Female professor at KFBS, agreed to preview Ms. Brown's research with an eye toward becoming her advisor and "second faculty reader".  In response to Dr. Crawford's requests to assist Ms. Brown, UNC proceeded to change its guidelines regarding who was eligible to be a

second faculty reader, which disqualified Dr. Crawford.

109.    On January 17, 2022, Ms. Brown wrote to KFBS Dean Suzanne Barbour. On January 23, 2022, Kate McAnulty, Associate Dean for Student Affairs, told Ms. Brown to "put her energy elsewhere."

110.    Ms. Brown complained to every internal person that she could at UNC-Chapel Hill to no avail.

111.    Defendant UNC-Chapel Hill does not have a formal protocol to handle this type of matter. There is no information in the graduate student handbook relating to Professor's dismissing a student from a PHD program for non-academic related matter.

112.    The lack of a formal process allows people like the individual Defendants named in this complaint to make discriminatory and negligent decisions without any oversight. Defendant UNC was made aware of all of the individual Defendant's actions and ratified the actions by these individual Defendants.

**Continuing External Retaliatory Conduct**

113.    Ms. Brown focused her direction on finding a suitable alternative Ph.D. program. The Individual Defendants in turn attempted to interfere with her plans as she sought to transfer to another high-quality public or private institution. Ms. Brown learned of repeated attempts to sabotage her prospects in the form of negative innuendo from some combination of Christian, Melwani, and Desai to the effect that (1) Ms. Brown is "un-collegial" or "difficult", (2) that she is "divisive", (3) her work fell short of UNC academic standards; (4) she was unproductive and generated no meaningful research content.

114.    Ms. Brown continued to maintain passing grades throughout the remainder of her education at UNC:

| | | | | |
|---|---|---|---|---|
| 2021, FALL | | | | |
| Course | Description | Attempted | Earned | Grade |
| BUSI 809 | APPLD RES METHODS 11 | 3.000 | 3.000 | P |
| BUSI 899 | SEMINAR | 1.500 | 1.500 | P |
| PSYC 863 | METH OF SOC PSYCHOL | 3.000 | 3.000 | P |
| SOCI 760 | DATA COLLECTION METHODS | 3.000 | 3.000 | P |

115.    Ms. Brown considered transferring to Duke because it is a sister school to UNC and her credits would have transferred.  However, Melwani and Christian had effectively undercut that opportunity when they communicated negative inaccurate comments about Ms. Brown to Dr. Angelica Lee, who served on Duke's admission committee.

116.    Ms. Brown landed interviews at Columbia University, Yale, and Harvard Business School.  Yale faculty members made it known that they were aware of and concerned about her issues at UNC during her February 4, 2022 Interview.

117.    UNC has since admitted in its position statements to agencies investigating Ms. Brown's complaints that they discussed Ms. Brown's "performance" and competence with institutions outside of UNC.

118.    Defendants' representations as to Ms. Brown's capacities are fundamentally untrue and distorted. For example, upon information and belief, Desai has obtained a sizable grant based on the research foundation Ms. Brown helped provide for the women of color motherhood project that Desai directed her to abandon.

**Discrimination and Damages Incurred by Ms. Brown**

119.    Ms. Brown was treated substantially differently than the other non African-American female students in the OB program.

120.    Ms. Brown received significant pushback on every project that she worked, more than any other student received.

121.    Other students were allowed to research and work on projects on issues they had significant interests and could personally relate or their cultural identity without any meaningful pushback or restrictions.

   A. A white female student was given latitude to work a project prioritizing women's issues.

   B. Another student who had a history of dealing with mental health issues was allowed to work on projects dealing with mental health issues.

   C. Another student, whose family immigrated to the United States, was allowed to work on projects related to immigration.

122.    Upon information and belief, any feedback or suggestions given to these other students relating to their projects did not jeopardize the integrity of the research or project.

123.    This is distinguished from Ms. Brown as her projects which were based on her cultural identity were consistently marginalized and subjected to material changes that would significantly alter the scope of her projects.

124.    As the foreseeable, direct and proximate result of Defendants' discriminatory and unlawful conduct, acts and omissions, Ms. Brown has suffered, and will continue to suffer, actual and economic damages and non-economic damages in amounts not presently known.

125.    Ms. Brown's career prospects and opportunity to earn future income have been substantially damaged. Ms. Brown applied for but was rejected from several Ph.D. programs

due to Defendant's retaliatory actions.

126. Ms. Brown was unable to get accepted into another Organizational Behavior program at another university that is Comparable to UNC- Chapel Hill.

127. Ms. Brown did graduate with Master's Degree in Management however this was not was she was told that she would receive a Master's in Organizational Behavior. In her 2 years, she had never even taken a graduate level course in management.

128. Ms. Brown's membership in the Ph.D. Project Organization, which she has been affiliated with since 2015, was revoked, which has created further reputational damage.

129. Ms. Brown has and will continue to suffer humiliation and severe emotional distress and related loss of enjoyment of life.

130. The discriminatory and retaliatory conduct of the Defendants was willful and reflects deliberate indifference to her federally protected rights.

131. Pursuant to the University of North Carolina System Code of Conduct, Defendant UNC and Defendant UNC BOG were required to adopt a code of conduct that specifies he types of sanctions that may be imposed for each category of prohibited conduct. Ranges of violations and ranges of sanctions are permissible. See https://www.northcarolina.edu/apps/policy/doc.php?type=pdf&id=832.

132. Pursuant to same policy, for violations that resulted in suspension or expulsion, a student is entitled to have an investigation completed by the University and then is entitled to a hearing.

133. Ms. Brown did not receive either before being removed from the Ph.D program.

134. This was a clear violation of the Defendant UNC BOG's policies and procedures and Defendant UNC's Student Code of Conduct (The Instrument of Student Judicial Governance).

135. Ms. Brown has and will continue to suffer humiliation and severe emotional distress and related loss of enjoyment of life and because of these events has faced heightened depression and anxiety.

## Count I
### Disparate Treatment Under 42 U.S.C. §§ 1981 and 1983 (Against All Defendants)

136. Plaintiff realleges and incorporates the above paragraphs by reference as if fully set forth herein.

137. Under § 1981(a)-(b), Plaintiff has the same rights as white citizens to make and enforce employment contracts, including the making, performance, modification, and

termination of her contract, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship, including but not limited to employment.

138.   In violation of § 1981(a), Defendants engaged in disparate treatment based on her race, denying Plaintiff the enjoyment of the benefits, privileges, terms, and conditions of her contractual relationship.

139.   The disparate treatment to which she was subjected included the following acts:

a.     Plaintiff's competence and capacities were minimized and her capacity to direct her research output was reduced, in contrast with the latitude extended to white students.

b.     Plaintiff's research was consistently subjected to interference and lacked the support from her primary academic advisors that was customarily extended to white students.

c.     Plaintiff was subjected to stereotypical assumptions regarding her demeanor and behavior that are tropes regularly associated with pejorative racial views of African-American females.

d.     Plaintiff's high levels of academic performance and achievement were not deemed sufficient conditions to continue her enrollment in the Ph.D program, a contrast with how Defendants measured the qualifications of white students.

140.   As alleged throughout this Complaint, UNC and Defendants Melwani, Desai, and Christian knowingly and intentionally discriminated against Plaintiff based on race.

141.   Plaintiff's claims against Defendants Melwani, Desai, and Christian pursuant to 42 U.S.C.A. § 1981 are effectuated by 42 U.S.C.A. § 1983.

142.   Defendants Melwani, Desai and Christian's violations of Plaintiff's rights occurred while they were acting under color of state law, and local ordinances, regulations and customs of North Carolina in violation of the Equal Protection Clause of the Fourteenth Amendment, thus entitling Plaintiff to all appropriate relief provided under 42 U.S.C.A. § 1983.

143.   The conduct of the UNC and the Individual Defendants was intentional and in reckless disregard to Plaintiff's rights under clearly established federal law.

144.   As the direct and proximate result of the Defendants' violations of § 1981, Plaintiff has suffered substantial damages including, without limitation, actual and consequential damages for economic loss.

145.   As the direct and proximate result of the Defendants' unlawful actions, Plaintiff has also suffered substantial non-economic damages including, without limitation, emotional and physical suffering and distress, humiliation, and intangible injury from the deprivations of her rights.

**Count II**
**Unlawful Retaliation Under 42 U.S.C. §§ 1981 and 1983 (Against**
**All Defendants)**

19

146.     Plaintiff realleges and incorporates the above paragraphs by reference as if fully set forth herein.

147.     42 U.S.C.A. § 1981 prohibits an entity from discriminating against an individual with which it enjoys contractual rights and privileges, including but not limited to employment, because of their opposition to unlawful discrimination based on race or because of their participation in protected activity.

148.     In violation of Section 1981, Defendants UNC, Melwani, Desai, and Christian retaliated against Plaintiff by actions including but not limited to her termination from the Ph.D program at Kenan-Flagler Business School; providing false and misleading negative information regarding Plaintiff's academic performance, which contributed to her termination; and reporting to other educational institutions a false narrative regarding Plaintiff's academic abilities and collegiality.

149.     Plaintiffs's retaliation claims against the Individual Defendant to 42 U.S.C. § 1981 are effectuated by 42 U.S.C.A. § 1983.

150.     Defendants Melwani, Desai and Christian's violations of Plaintiff's rights occurred while they were acting under color of state law, and local ordinances, regulations and customs of North Carolina in violation of the Equal Protection Clause of the Fourteenth Amendment, thus entitling Plaintiff to all appropriate relief provided under 42 U.S.C.A. § 1983.

151.     The conduct of UNC and Individual Defendants was intentional and in reckless disregard to Plaintiff's rights under clearly established federal law.

152.     As the direct and proximate result of the Defendants' violations of Section 1981, Plaintiff has suffered substantial damages including, without limitation, actual and consequential damages for economic loss in amounts that will be proven at trial.

153.     As the direct and proximate result of the Defendants' violations of Section 1981, Plaintiff has also suffered substantial non-economic damages, including without limitation, emotional and physical suffering and distress, humiliation, and intangible injury from the deprivations of her rights.

## Count III
## Violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.A. § 2000e-2(m)
## Disparate Treatment (Against UNC)

154.     Plaintiff realleges and incorporates the above paragraphs by reference as if fully set forth herein.

155.     Plaintiff was subjected to unlawful employment practices by Defendant UNC for which her race and gender were motivating factors, in violation of 42
U.S.C.A. § 2000e-2(m).

156.     The unlawful discriminatory practices to which Plaintiff was subjected included the acts of disparate treatment described herein at ⁋ 123.

157.    The conduct of UNC was intentional and in reckless disregard to Plaintiff's rights under clearly established federal law.

158.    As the direct and proximate result of the Defendants' violations of Title VII, Plaintiff has suffered substantial damages including, without limitation, actual and consequential damages for economic loss.

159.    As the direct and proximate result of the Defendants' violations of Title VII, Plaintiff has also suffered substantial non-economic damages, including without limitation, emotional and physical suffering and distress, humiliation, and intangible injury from the deprivations of her rights.

## Count IV
## Violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e *et seq*. Retaliation (Against UNC)

160.    Plaintiff realleges and incorporates the above paragraphs by reference as if fully set forth herein.

161.    Plaintiff was subjected to discriminatory actions by Defendant UNC because she opposed practices made unlawful by Title VII or because she made a charge and participated in an investigation of practices made unlawful by Title VII, in violation of 42 U.S.C.A. § 2000e-3(a).

162.    The unlawful retaliation to which Plaintiff was subjected included the discriminatory practices described herein at ⁋ 132.

163.    Based upon the actions described herein, Defendant UNC created a retaliatory hostile environment for Plaintiff that would have reasonably dissuaded an employee from engaging in protective activity.

164.    The conduct of UNC was intentional and in reckless disregard to Plaintiff's rights under clearly established federal law.

165.    As the direct and proximate result of the Defendants' violations of Title VII, Plaintiff has suffered substantial damages including, without limitation, actual and consequential damages for economic loss.

166.    As the direct and proximate result of the Defendants' violations of Title VII, Plaintiff has also suffered substantial non-economic damages, including without limitation, emotional and physical suffering and distress, humiliation, and intangible injury from the deprivations of her rights.

## COUNT V
## Race Discrimination in Violation of Title VI, 42 U.S.C. § 2000d (Against UNC)

167.    Plaintiff realleges and incorporates the above paragraphs by reference as if fully set forth herein.

168.    UNC is an entity receiving federal financial assistance.

169.    Plaintiff was subjected to unlawful treatment by UNC, in that UNC had knowledge of, and failed to correct, discriminatory practices committed against Plaintiff, as alleged herein in ⁋ 123 and ⁋ 132.

170.    As the direct and proximate result of UNC's violations of Title VI, Ms. Plaintiff has suffered substantial damages including, without limitation, actual and consequential damages for economic loss.

## COUNT VI
### Discrimination under the Rehabilitation Act, 29 U.S.C.A. §794 (Against UNC and UNC BOG)

171.    Plaintiff realleges and incorporates the above paragraphs by reference as if fully set forth herein.

172.    Defendant UNC engages in a program or activity that receives federal financial assistance as defined by Section 504 of the Rehabilitation Act of 1973, as codified by 29 U.S.C.A. § 794.

173.    Section 504 of the Rehabilitation Act mandates that "no otherwise qualified individual with a disability…shall, solely by reason of her his disability,…be subjected to dicrimination under any program under any program or activity receiving federal financial assistance." 29 U.S.C.A. § 794(a).

174.    During the time frame alleged in this complaint, Plaintiff suffered from the condition of post-traumatic stress disorder ("PTSD"), which substantially limited one or more life activities.

175.    Plaintiff engaged in protected activity by exercising her statutory rights under the Rehabilitation Act, in that she requested reasonable accommodations in the form of extended academic deadlines in instances when her PTSD symptoms were exacerbated.

176.    Defendant UNC retaliated against Plaintiff for exercising her statutory rights under the Rehabilitation Act by subjecting her to negative performance evaluations based partly on her requests for reasonable scheduling accommodations related to her disability and by treating said extensions as a basis for terminating her from the Ph.D. program.

177.    As the direct and proximate result of the aforementioned retaliatory conduct, Plaintiff suffered substantial damages including, without limitation, actual and consequential damages for economic loss.

## COUNT VII
### Wrongful Discharge in Violation of Public Policy
### (Against UNC and UNC BOG)

178.    Plaintiff realleges and incorporates the above paragraphs by reference as if fully set forth herein.

179.    The public policy of North Carolina, codified in the North Carolina Equal Employment Practice Act, N.C. Gen. Stat. § 143-422.2(a), prohibits entities that employ more than 15 persons from discriminating on the basis of race, religion, national origin, age, sex, or handicap. The public policy of North Carolina further makes it unlawful to discriminate based on engaging in protected activity in the form of opposition to said prohibited discrimination.

180.    Defendant UNC violated the public policy of North Carolina by terminating Plaintiff for engaging in protected activity by making internal complaints of race discrimination. The unlawful retaliation to which Plaintiff was subjected included the discriminatory practices described herein at ¶ 132.

181.    As the direct and proximate result of UNC's wrongful discharge in violation of public policy, Plaintiff has suffered substantial damages including, without limitation, actual and consequential damages for economic loss.

182.    As the direct and proximate result of UNC's wrongful discharge in violation of public policy, Plaintiff has also suffered substantial non-economic damages, including without limitation, emotional and physical suffering and distress, humiliation, and intangible injury from the deprivations of her rights.

## VIII VIOLATION OF ARTICLE I, SECTION 19 OF THE CONSTITUTION OF THE STATE OF NORTH CAROLINA (Against UNC and UNC BOG)

183.    The foregoing paragraphs are re-alleged and incorporated by reference herein.

184.    Ms. Brown alleges she has a property interest in her employment with Defendant UNC and Section 1, Article I, of the Constitution of North Carolina guarantees to the citizens of the State "the enjoyment of the fruits of their own labor" and declares this an inalienable right, and Defendant UNC prevented Plaintiff from being able to pursue her chosen profession and other employment, without unreasonable actions and interference, and based on the restrictions imposed by Defendant UNC.

185.    The effects of unemployment on society and the economy do not promote the general welfare of the citizens, and when such unemployment is caused by an employer, that contravenes this public policy for the good of all.

186.    Defendant UNC acted arbitrarily and capriciously when they disciplined Ms. Brown without regard to policy, denied Ms. Brown an investigation into her claims, denied her the ability to grieve and appeal her dismissal from the program.

187.    Defendant UNC acted under color of state and local laws by denying Plaintiff her constitutional right to work in an environment free from harassment, discrimination and retaliation pursuant to and guaranteed by the Fourteenth Amendment to the United States Constitution in violation of 42 U.S.C. § 1983.

188. Defendant UNC acted under color of state and local laws by denying Plaintiff her constitutional right to work in an environment free from harassment, discrimination and retaliation pursuant to and guaranteed by Article I, Section 19 of the North Carolina Constitution.

189. Ms. Brown alleges at all times alleged herein, she was qualified for multiple assignments and positions and was prohibited from furthering her Program further was subjected to disparate treatment due to her gender/sex in terms of the work conditions, privileges, benefits and work environment.

190. Ms. Brown contends that Defendant UNC's reason for removing her from a viable source of income, any form of work and benefits, yet refusing to terminate her was pretextual, punitive and retaliatory.

191. Ms. Brown alleges that Defendant UNC knew or should have known that the individual Defendants listed were unjustifiably treating her differently than other OB students. Notwithstanding, Defendant UNC did nothing, and its actions perpetuated the cycle. Further, Defendant UNC's failure to act accordingly, effectively ratified and condoned the adverse treatment of MS. Brown

192. Ms. Brown contends that as a result of Defendant's discriminatory and retaliatory treatment toward her, she has suffered and continues to suffer physical manifestations of trauma and emotional distress, including but not limited to, insomnia, fear, chronic depression, chronic anxiety and stress.

193. Defendant UNC and Defendant UNC BOG failed to abide by their own policies and procedures.

194. They failed to investigate the alleged violation of code of conduct and failed to give Ms. Brown an appeal.

195. Ms. Brown had a protected property and liberty interest in her employment and the manner in which the Defendant has denied Plaintiff employment, violated her rights under the N.C. State Constitution and thus violates the public policy as express in the N.C. State Constitution.

196. Additionally, as a proximate result of Defendants' violations of the public policy of North Carolina, as against Ms. Brown, and thus by reason of denying Plaintiff full participation and interest in her employment by denying her the fruits of her labor , Plaintiff has incurred and suffered substantial actual damages, including lost income (past and future) and benefits and other economic losses, past and future mental anguish and emotional distress, whereby Plaintiff's distress has resulted in both emotional and physical problems, including but not limited to generalized anxiety and depressive episodes, plaintiff's enjoyment of life was impacted negatively, employment reputation and other losses to be proven at trial in *excess* of $25,000, together in interest thereon at the prevailing rate.

## Count IX
## Tortious Interference with Contractual Relationships (Against
## Individual Defendants)

197.  Plaintiff realleges and incorporates the above paragraphs by reference as if fully set forth herein.

198.  Plaintiff's employment with the UNC was a contractual relationship under North Carolina common law.

199.  Defendants Melwani, Desai and Christian were not parties to Plaintiff's contractual relationship, but knew of the contractual relationship.

200.  The Individual Defendants interfered with Plaintiff's contractual relationship by providing false and misleading information about her academic performance and collegiality during her academic review process, for the express purpose of terminating Plaintiff's contractual relationship with UNC.

201.  The Individual Defendants acted willfully and maliciously.

202.  The Individual Defendants' conduct directly and proximately caused Plaintiff to suffer actual damages both economic and non- economic.

203.  Based on the willful and malicious conduct of the Individual Defendant, Plaintiff is entitled to recover punitive damages in an amount to be determined at trial under N.C. Gen. Stat. § 1D-15.

## Count X
## Disability Failure to Accommodate[1]

204.  Plaintiff realleges all previous paragraphs as if set forth fully herein.

205.  Plaintiff disclosed a medical condition to Defendants in August 2020.

206.  At all times relevant, Plaintiff was able to perform the essential functions of her job.

207.  Plaintiff was initially told that she was approved for the reasonable accommodation and that the accommodation would not negatively impact her job or the program.

208.  Defendants used Plaintiff's requests for an accommodation as a reason to remove her from the program.

209.  The accommodations would not cause the Defendant any undue hardships.

---

[1] Pursuant to N.C. Gen. Stat. § 143-300.35, any sovereign immunity is waived as Plaintiff was a state employee at the time.

210. Plaintiff has been harmed financially and emotionally by Defendant's failure to approve her reasonable accommodations.

211. The Defendant's conduct and failure to accommodate constitutes a violation of the American with Disabilities Act 42 U.S.C. § 12101, *et seq*., 42 U.S.C. §1981.

212. Defendant also retaliated against Plaintiff when they removed her from the program due to her request of a reasonable accommodation.

## **<u>Prayer for Relief</u>**

**WHEREFORE**, Plaintiff demands judgment be entered on her behalf against Defendants and grants the following relief:

A. An award of compensatory damages for Plaintiff, in an amount of to be determined by the enlightened conscience of the trier of fact, jointly and severally, against Defendants;

B. An award of back pay and front pay;

C. An award of pre-judgement and post-judgment interest;

D. An award of costs, including, but not limited to, discretionary costs;

E. Attorneys' fees and expenses incurred in pursuing this case under 42 U.S.C. § 1988;

F. Punitive damages sufficient to punish each Defendant and deter others from like misconduct;

G. Cost of suit;

H. Any other and further relief this Court deems just and proper; and

I. Any other and further relief to which they may be entitled.

26

**JURY TRIAL DEMANDED**

Plaintiff demands trial by jury on all Counts.

This the  30  day of August 2022.

 s/Lawrence Wooden
 s/Walter Bowers
 Lawrence Wooden, NC Bar No. 47199
 Walter Bowers, NC Bar No.
 Wooden Bowers PLLC
 8420 University Exec. Park Dr. Suite 810
 Charlotte, NC 28262
 P: (704) 665-5838
 F: (704) 973-9380
 E: lwooden@wbvlaw.com
 *Co-Counsel for Plaintiff*

 s/Artur Davis
 ARTUR DAVIS
 ASB-3672-D56A
 **HKM Employment Attorneys LLP**
 (application for admission pro hac vice forthcoming)
 2024 3rd Ave. North Suite 307
 Birmingham AL 35203
 telephone: 205-881-0935
 telefax: NA
 *Co-counsel for Plaintiff*