IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

ANGELICA ROSE BROWN,          )
                              )
          Plaintiff,          )
                              )
     v.                       )
                              )
UNIVERSITY OF NORTH CAROLINA  )          1:22-cv-717
at CHAPEL HILL; SHIMUL MELWANI )
(in her individual capacity);  )
SHREEDHARI DESAI (in her       )
individual capacity); MICHAEL  )
CHRISTIAN (in his individual   )
capacity); BOARD OF GOVERNORS  )
OF THE UNIVERSITY OF NORTH     )
CAROLINA,                      )
                              )
          Defendants.         )

## MEMORANDUM OPINION AND ORDER

**OSTEEN, JR., District Judge**

Before this court is a Motion to Dismiss Amended Complaint[1]

filed by Defendants Shimul Melwani, Shreedhari Desai, and

Michael Christian (together, the "Individual Defendants"),

(Doc. 27), and a Motion to Dismiss Amended Complaint filed by

Defendants the University of North Carolina at Chapel Hill

---

[1] LR 1.7(a) requires that all typewritten pleadings be
double-spaced. The amended complaint, (Doc. 26), is single-
spaced and likely does not comply with the rules on font size.
Although this court will not strike the amended complaint for
failure to comply with the Local Rules, the court directs
Plaintiff to be familiar with and follow those rules in the
future.

("UNC-CH") and the Board of Governors of the University of North Carolina (together, the "University Defendants"), (Doc. 29).

For the reasons stated below, the Individual Defendants' motion will be granted, and the University Defendants' motion will be granted in part and denied in part.

## I. **FACTUAL BACKGROUND**

On a motion to dismiss, a court must "accept as true all of the factual allegations contained in the complaint." Ray v. Roane, 948 F.3d 222, 226 (4th Cir. 2020) (internal quotation mark omitted) (quoting King v. Rubenstein, 825 F.3d 206, 212 (4th Cir. 2016)). The facts, taken in the light most favorable to Plaintiff, are as follows.[2]

### A. **Early Fall 2020**

Plaintiff was enrolled as a first-year Ph.D. student in the five-year Organizational Behavioral Ph.D. Program (the "Program") at the University of North Carolina at Chapel Hill's Kenan-Flagler Business School ("KFBS") during the 2020–2021 academic year. (Amended Complaint ("Am. Compl.") (Doc. 26)

---

[2] A complaint should be "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Plaintiff's references to, inter alia, Nicole Hannah Jones or the P&N Students of Color, (Am. Compl. (Doc. 26) at 6), are completely irrelevant to Plaintiff's claims. Those types of allegations will be ignored.

- 2 -

¶¶ 4, 39.)[3] She was the only Black woman in the program that year. (Id.) As part of the Program, Plaintiff was employed by UNC-CH as a Graduate Research Assistant ("GRA"). (Id. ¶¶ 40-43.) UNC-CH defines a GRA as a graduate student who is "enrolled as a full-time student, and engaged in research activities directly related to their program of study under the supervision or in collaboration with a member of the graduate faculty." (Id. ¶ 44.) While employed as a GRA, Plaintiff's initial salary in August 2020 was $33,333.36, and her salary increased to $34,444.44 by her graduation from KFBS in May 2022. (Id.)

Prior to the commencement of the Program, Plaintiff received an email from Michael Christian, a White male Professor of Organizational Behavior at UNC-CH who was one of Plaintiff's "principal academic advisors." (Id. ¶¶ 20, 21, 45.) This email was sent to all of the Program's advisors and students, and read: "Hi all, . . . read this article and thought I'd pass it on, especially for [Plaintiff]." (Id. ¶ 45.) The article was titled "Modest Advice for Graduate Students" and "is described as a guide to survive 'imposter syndrome' at a graduate school." (Id.) Around the same time in the academic year, KFBS "failed to

---

[3] All citations in this Memorandum Opinion and Order to documents filed with the court refer to the page numbers located at the bottom right-hand corner of the documents as they appear on CM/ECF.

- 3 -

include a photo of [Plaintiff], its only black female PHD candidate, in its portfolio of candidates." (Id. ¶ 47.)

Plaintiff has a diagnosis of Post-Traumatic Stress Disorder ("PTSD"), and registered this disability with UNC-CH's Accessibility Resources and Services office prior to the start of classes for the 2020-2021 academic year. (Id. ¶¶ 49, 50.) In August and in September 2020, Plaintiff was "sexually assaulted and raped by a male acquaintance," which triggered her PTSD. (Id. ¶¶ 51, 54-55.) She disclosed her assaults to Christian, Shreedhari Desai, an Indian female Assistant Professor of Organizational Behavior in the Program and another of Plaintiff's principal academic advisors, and Shimul Melwani, an Indian female Assistant Professor, Associate Dean, and Coordinator for the Program, and told them that her PTSD was "exacerbated by" the assaults. (Id. ¶¶ 16, 18, 52-53, 55.) Plaintiff also told Christian and Melwani that she had filed a motion for a Domestic Violence Protection Order against her attacker. (Id. ¶ 55.) In late October 2020, Plaintiff was unable to attend "a non-mandatory seminar as she was preparing to attend a court hearing regarding her request for a protective order," and made this clear to Melwani and Christian. (Id. ¶ 56.) Melwani and Christian "admonished" Plaintiff, and one of them stated that Plaintiff "was being 'disrespectful' for

- 4 -

failing to attend an event they had taken time to organize." (Id.)

**B.    Research Projects and Classwork**

On October 2, 2020, Melwani invited Plaintiff to co-author a journal article on code-switching[4] by African-Americans in the workplace, in conjunction with Christian and Melwani. (Id. ¶ 57.) Later that month, Melwani and Christian "directed" Plaintiff to change the focus of the article from code-switching to "Black-on-Black peer pressure in the workplace." (Id. ¶ 58.) When Plaintiff "made it clear" that she disapproved of the topic change because the new topic had "a misplaced and inaccurate focus," Melwani and Christian "condescendingly" told Plaintiff that "she failed to grasp the foundations of research and that she lacked the expertise to evaluate the appropriate focus for an academic journal." (Id. ¶¶ 58-59.) As a result of this dispute, Plaintiff withdrew from the project on November 4, 2020. (Id. ¶ 60.)

In late November 2020, Plaintiff "participated in a social psychology session with Melwani regarding the vision of the Organizational Behavioral Program." (Id. ¶ 61.) During this session, Melwani advised Plaintiff that "the department was

---

[4] Plaintiff describes code-switching as "the variation of speech styles or interactive behavior in settings with persons of other races or ethnicities." (Am. Compl. (Doc. 26) ¶ 57.)

small, that 'we all talk to each other', and that key figures in the program should never be alienated." (Id.) Plaintiff "took this commentary as an implied threat to her academic future, given her recent disagreements with Melwani and Melwani's power within KFBS and the organizational behavior Ph.D[.] community." (Id.)

During the final months of 2020, Plaintiff began preparations for her own code-switching research project overseen by Christian. (Id. ¶ 62.) The Program's ordinary protocol for such a "primary research mission" is that Ph.D. students "recruit partners in or outside their institution to join their research team." (Id.) Christian "sought to enlist a doctoral candidate who had no prior engagement or familiarity with the target area of research" as a research partner for Plaintiff. (Id. ¶ 63.) Plaintiff "questioned the suitability of this individual," and Christian responded that "'we need someone Black' regardless of credentials." (Id.) Plaintiff counter-proposed "an African-American professor and faculty member at Howard University who had an extensive background in the subject of code-switching." (Id. ¶ 64.) Christian "rebuffed" Plaintiff's suggestion, stating that he "could never sanction an academic from Howard joining a research project without obtaining direct approval from the Chair of the department." (Id.)

Around this time, Plaintiff began correspondence with Dr. Sekou Bermiss, a Black professor at the University of Texas who maintains a mentorship network with Black Ph.D. students in the organizational behavior field. (Id. ¶ 69.) In late winter or early spring 2021, "Dr. Bermiss commented to faculty members in [Plaintiff's] department . . . that [Plaintiff] had entered his network." (Id.)

Plaintiff received her first semester grades on December 9, 2020. (Id. ¶ 65.) She received a grade of "Pass" for Christian's introductory class, while "the other members of her class" received a grade of "High Pass." (Id.) Plaintiff spoke to "her upper level peers in KFBS," who "conveyed to her that it was extremely rare for a student to receive anything other than a High Pass in Christian's introductory class." (Id. ¶ 66.) Christian "expressed no concerns over the quality of [Plaintiff's] work" prior to issuing the grade. (Id.)

In January 2021, Christian informed Plaintiff that "their relationship had become too 'damaged' to continue advising her on the code-switching project, principally because of their disagreements over the composition of the research team." (Id. ¶ 67.) In February 2021, Desai became Plaintiff's primary advisor for that project. (Id. ¶ 68.)

Starting in March 2021, Plaintiff "was increasingly subjected to adverse scrutiny and interference." (Id. ¶ 70.) On March 6, 2021, Plaintiff signed a letter alongside eleven of the twelve other Ph.D. candidates in her program which "expressed a desire for UNC to engage with anti-racism movements more deeply and to integrate equity-based insights more deeply into its research priorities." (Id. ¶ 71.) Plaintiff was the only Black woman to sign this letter. (Id.) "Almost immediately" after the letter was published, Desai "inquired of [Plaintiff] about her contacts with Dr. Bermiss, asking if she was seeking him out because 'he is Black,' and warned her against disparaging the program to people outside of it." (Id. ¶ 72.) Desai also asked Plaintiff to provide her GRE scores, which were four years old at the time and "irrelevant to [Plaintiff's] performance at KFBS." (Id.)

At the time, Desai and Plaintiff had been partners on a research project examining "the unique adverse impacts of motherhood on the professional standing of women of color." (Id. ¶ 73.) However, in "the latter part of March 2021, Desai instructed [Plaintiff] to stop participating in the motherhood project," as well as a colorism[5] project, in order to focus

---

[5] Plaintiff describes colorism as "the phenomenon of ethnic minorities favoring lighter skinned persons within their race." (Am. Compl. (Doc. 26) ¶ 74.)

exclusively on the code-switching project. (Id. ¶ 74.) According to Plaintiff, "[i]n the culture of most Ph.D. programs, building a combination of specialties is viewed as essential to growth," and Desai fully understood this. (Id.)

In May 2021, Plaintiff learned that, under Desai's direction, Black participants in a research survey for the code-switching project would be paid for their time "at a rate that translated into one cent a minute, roughly a tenth of the typical minimum rate paid for subject surveys of $1.50–2.00 per fifteen minutes." (Id. ¶ 75.) Plaintiff "expressed her view to Desai that the formula was an unethically low level of compensation," and Desai said the project had to operate within a $45.00 budget. (Id. ¶ 76.) To increase available funding for the code-switching project, Plaintiff suggested that they apply for the Wharton 2021 Diversity and Inclusion grant. (Id. ¶ 77.) Desai then applied for funding from this source for "the very motherhood project she directed [Plaintiff] to abandon." (Id.)

After learning that the budget for her code-switching project was $45.00, Plaintiff reached out to Melwani about potential funding sources, expressing that "KFBS had not properly allowed her a budget to conduct adequate research to support her research initiatives and requirements." (Id. ¶ 78.) Plaintiff "offered to pay for the research herself, but was

informed that funding must be derived from a professor's budget," which "left [Plaintiff] without an adequate means to complete research." (Id.) Desai then "exploded at [Plaintiff] that she had overstepped her boundaries, which escalated into Desai telling [Plaintiff] in a phone call that [Plaintiff] was 'not as competent as we though' and that [Plaintiff's] pre-admission research was not of the quality the Ph.D. program normally expected." (Id. ¶ 79.)

On June 1, 2021, Plaintiff requested that Dr. Matthew Pearsall, the incoming Ph.D. program coordinator, assign Plaintiff to another advisor. (Id. ¶ 80.) On or about June 2, 2021, Pearsall told Desai that Plaintiff had requested a new advisor, and Desai, Melwani, and Christian met to "strategize about removing [Plaintiff] from the PH.D. program." (Id. ¶¶ 81-82).

## C. **Reporting Discrimination**

After requesting new advisor, Plaintiff "made several overtures to UNC entities to report and redress the discrimination she had been subjected to within the Ph.D. Program." (Id. ¶ 83.) On June 5, 2021, Plaintiff met with Sherry Wallace, the Executive Director of KFBS's Engagement and Inclusion Program, to "report what she believed to be a pattern of discriminatory behavior within her program," and informed

Wallace that she intended to file a charge with UNC-CH's Equal Opportunity Compliance ("EOC") office. (Id. ¶ 84.)

On June 8, 2021, Wallace met with Christian, Melwani, and Desai, "who claimed that [Plaintiff] had become a source of difficulty and that they needed 'advice' on how to deal with her." (Id. ¶ 85.) Wallace informed Plaintiff about this meeting that same day, and Plaintiff reiterated her intent to file a complaint with the EOC office. (Id.) Also that same day, Plaintiff received a phone call from Dr. Angelica Leigh, a Black female professor at Duke University, informing Plaintiff that Leigh "had learned from Christian and Melwani that [Plaintiff] was causing 'problems' at UNC." (Id. ¶ 86.) Leigh warned Plaintiff that Plaintiff's "career was at risk." (Id.)

On June 12, 2021, Plaintiff met with Pearsall to "further discuss her lack of support in the Ph.D. program." (Id. ¶ 87.) At this meeting, Pearsall "stunned" Plaintiff by "commenting that her job and education" at KFBS "were in jeopardy." (Id.) Pearsall told Plaintiff that her "real concern should be that she had alienated faculty." (Id.) He also told her "that while there was 'no issue with [her] grades or work,' the view had emerged that she was 'no longer a good fit for the program.'" (Id.)

On June 18, 2021, Plaintiff filed a discrimination complaint with the EOC office and was interviewed by investigators.[6] (Id. ¶ 88.) On July 15, 2021, Plaintiff spoke with Wallace about the status of her EOC investigation. (Id. ¶ 89.) Wallace told Plaintiff that she had informed David Hoffman, a senior associate dean at KFBS, about Plaintiff's concerns about discrimination, and Wallace told Plaintiff "If I had known how f****** up this would get, that I never would have said anything." (Id.)

**D.    Annual Review**

On July 30, 2021, Plaintiff met with Christian and Pearsall to receive her annual review. (Id. ¶ 90.) Pearsall "acknowledged that [Individual Defendants] were the sources of the review, as Pearsall had no functional involvement with [Plaintiff]." (Id.) For her annual review, Individual Defendants evaluated Plaintiff in three areas: classwork, research, and faculty and student interactions. (Id.) Plaintiff's review was "a study in contradictions and untruths." (Id.)

---

[6] Plaintiff alleges in one instance that she filed her EEOC charge on June 18, 2021. (Am. Compl. (Doc. 26) ¶ 88.) Later in her amended complaint, she alleges she filed on June 17, 2021. (Id. ¶ 100.) This court will utilize June 18, 2021, as the date of filing for purposes of this order as the exact date is not relevant to this opinion.

During the annual review, Plaintiff was told "for the first time in her enrollment" that "multiple professors had complained that she had frequently obtained extensions on deadlines," despite the Program's "settled practice of permitting both White and Male students extensions and scheduling accommodations for reasons ranging from personal crises to writer's block with no penalty or consequence." (Id. ¶¶ 91–92.) Further, Plaintiff's extensions were "modest in scope, in the range of hours or a few days." (Id. ¶ 92.) As to her grades, Pearsall stated that Plaintiff "was not making adequate progress academically." (Id. ¶ 93.) Plaintiff took eight courses during the 2020–2021 academic year, which "is considered a high classwork load," (id. ¶ 94), and received four High Pass grades and four Pass grades, (Id. ¶ 93). The Program's student handbook's "prerequisite for continued enrollment requires that students pass their required courses, which [Plaintiff] had done." (Id. ¶ 94.)

When Plaintiff pointed this out to Pearsall, he "repeated his refrain from six weeks earlier that there were 'no issues' with her work or research but framed the issue as one of output, saying that [Plaintiff] had discontinued projects she had initially launched." (Id. ¶ 95.) Desai directed Plaintiff to "shelve two projects in which she had been fully engaged." (Id.) During the annual review, "Pearsall and Christian did not at any

- 13 -

point identify the metrics of project engagement or completion for a Ph.D. student, or explain what research expectations were during the first year." (Id.)

As to Plaintiff's faculty and student interactions, Pearsall and Christian stated that Plaintiff had "'burned bridges with faculty' to the point that it was unlikely she could form a dissertation committee to satisfy her doctorate requirements." (Id. ¶ 97.) Committee formation was not for at least three years, and "several new professors had begun to build relationships with [Plaintiff] that could have been foundations for her dissertation committee." (Id.) Christian stated that he viewed Plaintiff as "a source of 'damage,'" and commented that Plaintiff was "hurting people who are my friends and not just colleagues." (Id.) Plaintiff inferred from these comments that Individual Defendants "had become well aware of [Plaintiff's] complaints alleging discrimination on their part." (Id. ¶ 98.) At the end of the review, Pearsall and Christian informed Plaintiff "that she did not have a path forward in the Ph.D. Program and could transfer to another program or exit with a Masters' Degree in May of 2022." (Id. ¶ 99.)

### E. Removal from the Program

Individual Defendants received actual notice of Plaintiff's EOC office complaint on August 24, 2021, and Plaintiff was

informed that the EOC office would "conduct and conclude" its investigation by November 19, 2021. (Id. ¶¶ 101–02.) The investigation process "dragged on, plagued by delays." (Id. ¶ 103.) "Important pieces of evidence were unexamined," including the written version of Plaintiff's annual review, "which was evidently not finalized until December 21, 2021," hampering Plaintiff's ability to "document the differences between her review and objective aspects of her work, or to capture particular contradictions that surfaced during the [annual review] meeting." (Id.) Further, the EOC office's investigation was "flawed" because it "adopted the factual representations of faculty members over [Plaintiff's] version of events and ignored reasonable inferences concerning patterns of communication among staff. (Id. ¶ 104.) The investigators also "ignored the initial focus of [Plaintiff's] complaints of racial insensitivity and discriminatory conduct in favor of a narrow inquiry into whether the review process was influenced by knowledge of the EOC investigation." (Id.)

Plaintiff was removed from the Ph.D. Program after her annual review on July 30, 2021, but remained a student of the Organizational Behavioral Program "in a non-terminal Master's capacity" until May 2022. (Id. ¶ 105.) "In her efforts to remain in good standing and rebuild, she solicited and procured an

advisor," and also "continued to conduct research and apply for grants, but was not supported." (Id. ¶ 106.) After the annual review meeting, Plaintiff asked for details about the Kenan Institute's Small Research Grant Program, but Pearsall "informed her (inaccurately) that she was not eligible and would not provide her a letter of recommendation." (Id.) On November 22, 2021, Plaintiff met with Dean Hoffman, who knew of Plaintiff's mistreatment since on or about July 15, 2021, "in order to discuss the lack of support in securing research grant funds." (Id. ¶ 107.) Hoffman "was aware that [Plaintiff] had been 'put through hell' by the faculty, and that she had been pushed out of the Ph.D. Program." (Id.)

Plaintiff "continued to challenge her termination from the Ph.D. program," but UNC-CH "reiterated that [Plaintiff] would not be permitted to remain in the Ph.D. Program, this time citing as grounds the likelihood that she could not assemble a dissertation committee in three and a half years." (Id. ¶ 108.) In December 2021, Dr. Barbara Nobles Crawford, "the only Black Female professor at KFBS, agreed to preview [Plaintiff's] research with an eye toward becoming her advisor and 'second faculty reader.'" (Id. ¶ 109.) After Crawford requested to assist Plaintiff, UNC-CH "change[d] its guidelines regarding who was eligible to be a second faculty reader, which disqualified

Dr. Crawford." (Id.) On January 17, 2022, Plaintiff contacted Suzanne Barbour, Dean of KFBS. (Id. ¶ 110.) On January 23, 2022, Kate McAnulty, the Associate Dean for Student Affairs, "told [Plaintiff] to 'put her energy elsewhere.'" (Id.)

Plaintiff "complained to every internal person that she could at UNC-Chapel Hill to no avail." (Id. ¶ 111.) UNC-CH "does not have a formal protocol to handle termination of a student for non-academic reasons," and "[t]here is no information in the graduate student handbook relating to the dismissal of a student from a PHD program for non-academic related matters." (Id. ¶ 112.)

Due to Plaintiff's inability to re-join the Program, she "focused her direction on finding a suitable alternative Ph.D. program. The Individual Defendants in turn attempted to interfere with her plans as she sought to transfer[.]" (Id. ¶ 114.) Plaintiff learned that Individual Defendants repeatedly attempted to "sabotage her prospects" by calling Plaintiff "un-collegial," "difficult," and "divisive," and stating that her work "fell short of UNC academic standards," and that she was "unproductive and generated no meaningful research content." (Id.) Plaintiff "continued to maintain passing grades throughout the remainder of her education at UNC." (Id. ¶ 115.)

Plaintiff considered transferring to Duke University, where her credits from the Program would have transferred, but Melwani and Christian "effectively undercut that opportunity when they communicated negative inaccurate comments about [Plaintiff] to Dr. Angelica Lee, who served on Duke's admission committee." (Id. ¶ 116.) Plaintiff also secured interviews at Columbia University, Yale University, and Harvard Business School, but Yale University faculty members "made it known that they were aware of and concerned about [Plaintiff's] issues at UNC" during her interview. (Id. ¶ 117.) UNC-CH "has since admitted in its position statements to agencies investigating [Plaintiff's] complaints that they discussed [Plaintiff's] 'performance' and competence with institutions outside of UNC." (Id. ¶ 118.) Additionally, "Defendants' representations as to [Plaintiff's] capacities are fundamentally untrue and distorted." (Id. ¶ 119.) "For example, upon information and belief, Desai has obtained a sizeable grant" for the women of color motherhood project that Plaintiff helped provide the research foundation for and that "Desai directed her to abandon." (Id.)

Plaintiff was not accepted into another Organizational Behavior Program at an institution comparable to UNC-CH. (Id. ¶ 127.) She did graduate from KFBS with a Master's Degree in Management, despite being told that she would receive a Master's

Degree in Organizational Behavior and despite never "tak[ing] a graduate level course in management" in her two years at KFBS. (Id. ¶ 128.)

During her time in the KFBS Occupational Behavior Program, Plaintiff "was treated substantially differently than the other non African-American female students." (Id. ¶ 120.) Plaintiff "received significant pushback on every project that she worked on, at a rate more than any other student received." (Id. ¶ 121.) For example, a White female student "was given latitude to work on a project prioritizing women's issues," a student who "had a history of dealing with mental health issues was allowed to work on projects dealing with mental health issues," and a student "whose family immigrated to the United States, was allowed to work on projects related to immigration." (Id. ¶ 122.) Feedback and suggestions given to these students "did not jeopardize the integrity of the research or project," unlike Plaintiff, whose "projects were based on her cultural identity [and] were consistently marginalized and subjected to material changes that would significantly alter the scope of her projects." (Id. ¶¶ 123–24.)

Plaintiff "applied for but was rejected from several Ph.D. programs due to Defendant's retaliatory actions," and was unable to be accepted into another program at an institution comparable

- 19 -

to UNC-CH. (Id. ¶¶ 126–27.) Additionally, Plaintiff's membership in "the Ph.D. Project Organization, which she has been affiliated with since 2015, was revoked," creating further reputational damage. (Id. ¶ 129.) These events caused Plaintiff to suffer "humiliation and severe emotional distress and related loss of enjoyment of life." (Id. ¶ 130.)

Plaintiff lists ten claims for relief, see Fed. R. Civ. P. 8(a)(2), denominated as counts, in her complaint:

I. "Disparate Treatment Under 42 U.S.C. §§ 1981 and 1983 (Against All Defendants)"

II. "Unlawful Retaliation Under 42 U.S.C. §§ 1981 and 1983 (Against All Defendants)"

III. "Violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.A. § 2000e-2(m) Disparate Treatment (Against UNC)"

VI. "Violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e et seq. Retaliation (Against UNC)"

V. "Race Discrimination in Violation of Title VI, 42 U.S.C.§ 2000d (Against UNC)"

VI. "Discrimination under the Rehabilitation Act, 29 U.S.C.A. § 794 (Against UNC and Board of Governors)"

VII. "Wrongful Discharge In Violation of Public Policy (Against UNC and Board of Governors)"

VIII. "Violation Of Article I, Section 19 Of The Constitution Of The State Of North Carolina (Against UNC and Board of Governors)"

IX. "Tortious Interference with Contractual Relationships (Against Individual Defendants)"

X. "Disability Failure to Accommodate"

(See Am. Compl. (Doc. 26) at 19–27.)

## II. **PROCEDURAL HISTORY**

Plaintiff was issued a Right to Sue Letter by the EEOC on June 5, 2022. (Am. Compl. (Doc. 26) ¶ 23.) Plaintiff filed her Complaint, (Doc. 1), on August 30, 2022, and filed an Amended Complaint, (Doc. 26), on January 3, 2023. On January 17, 2023, both the Individual Defendants and the University Defendants filed motions to dismiss Plaintiff's amended complaint under Federal Rule of Civil Procedure 12(b)(6), (Docs. 27, 29), and memoranda in support of those motions, (Docs. 28, 30). Plaintiff filed responses to each motion, (Docs. 31, 32), and each group of Defendants filed a reply, (Docs. 33, 34).

## III. **STANDARD OF REVIEW**

"To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as

true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). In other words, the plaintiff must plead facts that "allow[] the court to draw the reasonable inference that the defendant is liable" and must demonstrate "more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. at 678 (2009) (citing Twombly, 550 U.S. at 556-57 (1955).

When ruling on a motion to dismiss, this court accepts the complaint's factual allegations as true. Id. Further, this court liberally construes "the complaint, including all reasonable inferences therefrom . . . in the plaintiff's favor." Est. of Williams-Moore v. All. One Receivables Mgmt., Inc., 335 F. Supp. 2d 636, 646 (M.D.N.C. 2004). Nevertheless, the factual allegations must be sufficient to "raise a right to relief above the speculative level" so as to "nudge[] the[] claims across the line from conceivable to plausible." Twombly, 550 U.S. at 555, 570; see also Iqbal, 556 U.S. at 680; Francis v. Giacomelli, 588 F.3d 186, 193 (4th Cir. 2009) (applying the Twombly/Iqbal standard to evaluate the legal sufficiency of pleadings). A court cannot "ignore a clear failure in the pleadings to allege any facts which set forth a claim." Est. of Williams-Moore, 335 F. Supp. 2d at 646. Consequently, this court does not accept

mere legal conclusions as true, and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678.

Generally, in resolving a Rule 12(b)(6) motion to dismiss, "a district court cannot consider matters outside the pleadings without converting the motion into one for summary judgment." Occupy Columbia v. Haley, 738 F.3d 107, 116 (4th Cir. 2013) (citing Fed. R. Civ. P. 12(d)). The court can, however, properly consider "documents attached to the complaint, as well as those attached to the motion to dismiss, so long as they are integral to the complaint and authentic." Philips v. Pitt Cnty. Mem'l Hosp., 572 F.3d 176, 180 (4th Cir. 2009) (citation omitted).

Here, Plaintiff attached a copy of her EEOC Charge of Discrimination to her complaint. (Ex. A ("Plaintiff's EEOC Charge") (Doc. 26-1).) University Defendants also attached a copy of Plaintiff's EEOC Charge as they received it. (Doc. 30-1.) Though there is some dispute between the parties as to the date on which the Charge was received by the EEOC, (see Doc. 30 at 17–18; Doc. 32 at 4–6; Doc. 33 at 6–7), neither party challenges the authenticity of Plaintiff's EEOC Charge itself, therefore this court will consider it in resolving the motions to dismiss.

Employment discrimination complaints must meet the Twombly/Iqbal plausibility standard; however, the plaintiff is not required to make out a prima facie case or satisfy any heightened pleading requirements at the motion to dismiss stage. Swierkiewicz v. Sorema N.A., 534 U.S. 506, 511 (2002); McCleary-Evans v. Md. Dep't of Transp., State Highway Admin., 780 F.3d 582, 584-85 (4th Cir. 2015). The plaintiff is, however, required to plead facts that permit the court to reasonably infer each element of the prima facie case. McCleary-Evans, 780 F.3d at 585; see also Iqbal, 556 U.S. at 682-83 (plaintiff must plead facts supporting reasonable inference of discriminatory intent); Coleman v. Md. Ct. of Appeals, 626 F.3d 187, 191 (4th Cir. 2010) (stating that a complaint must "assert facts establishing the plausibility" that plaintiff was terminated based on race).

## IV.   FILING REQUIREMENTS AND STATUTE OF LIMITATIONS

Plaintiff brings her employment discrimination claim in part under Title VII of the Civil Rights Act of 1964. (See Am. Compl. (Doc. 26) at ¶¶ 21, 22.) The enforcement provisions of Title VII state that "[a] charge under this section shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e-5(e)(1); see also Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 110 (2002) ("[A] litigant has up to 180 . . . days after

- 24 -

the unlawful practice happened to file a charge with the EEOC"). "Each discrete discriminatory act starts a new clock for filing charges alleging that act." <u>Morgan</u>, 536 U.S. at 113.

University Defendants argue that Plaintiff's Title VII claims are untimely because "all the alleged unlawful employment practices occurred more than 180 days before she filed her charge of discrimination with the EEOC." (Br. in Supp. of University Defs.' Mot. to Dismiss Am. Compl. ("Univ. Defs.' Br.") (Doc. 30) at 17.) This allegation is based on the copy of the EEOC Charge attached to University Defendants' brief, which is stamped "Received on 02/21/2022" at the bottom of the document. (Doc. 30-1 at 1.) However, Plaintiff alleges in her complaint that she filed the charge on January 12, 2022, (Am. Compl. (Doc. 26) ¶ 22), and the copy of the charge that she attaches to her complaint reflects only that it was signed by Plaintiff on January 10, 2022, (Ex. A (Doc. 26-1) at 1–2). In support of her assertion that she filed her charge January 12, 2022, Plaintiff also attaches to her complaint a letter of representation from her attorney at that time to the EEOC dated January 12, 2022. (Ex. B (Doc. 26-2) at 1.) Due to the nature of the standard of review for a motion to dismiss under Rule (12)(b)(6), the court declines to address the timeliness issue at this stage of the proceedings because of the disputed issues

of fact. This issue may be further considered following discovery wherein additional information may be available to resolve the disputed issues.[7]

As for Plaintiff's § 1981 claims against Individual Defendants, 42 U.S.C. § 1981 does not contain an independent statute of limitations. Jones v. R.R. Donnelly & Sons Co., 541 U.S. 369, 371 (2004). However, 28 U.S.C. § 1658, passed in 1990 and enacted in 1991, specifies a four-year statute of limitations for any "civil action arising under an Act of Congress enacted after the date of the enactment of this section." 28 U.S.C. § 1658. The Supreme Court has held that, because § 1981 was expanded by legislative action in 1991 to cover racial discrimination in any term or benefit of employment, the four-year federal statute of limitations applies to § 1981 race discrimination claims. R.R. Donnelly, 541 U.S. at 383-84. Plaintiff alleges multiple instances of disparate treatment and retaliation in the four-year period prior to the date when Plaintiff filed her complaint in this matter. (See Am. Compl. (Doc. 26) ¶¶ 45, 52, 55-56, 58, 60-62, 65, 67-68, 70-71,

---

[7] This court also notes that Plaintiff alleges disparate treatment and retaliatory acts as late as December 2021, and possibly even as late as February 2022. (Am. Compl. (Doc. 26) ¶¶ 109, 117.)

74-75, 80, 82, 84-89, 90, 100, 102, 114, 117.) Therefore, Plaintiff's § 1981 claims are timely.

As described above, the applicable time limitation for Plaintiff's Title VII claims is that the EEOC charge must be filed within 180 days of the alleged unlawful employment practice, and the statute of limitations for Plaintiff's § 1981 claims is four years prior to the filing date of the complaint in this matter.

For Title VII, the 180-day window "is not a jurisdictional prerequisite to suit in federal court, but a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling." Zipes v. Trans World Airlines, Inc., 455 U.S. 385, 393 (1982); see also Hentosh v. Old Dominion Univ., 767 F.3d 413, 417 (4th Cir. 2014); Fort Bend County, Texas v. Davis, 587 U.S. ___, 139 S.Ct. 1843, 1850-51 (2019).

Claims ordinarily are not dismissed due to statutes of limitations at the motion to dismiss stage, unless "the facts necessary to conclude that plaintiff's claims are barred by the statute of limitations" are clearly set forth on the face of the complaint. Goodman v. Praxair, Inc., 494 F.3d 458, 464 (4th Cir. 2007); see also Richmond, Fredricksburg & Potomac R.R. Co. v. Forst, 4 F.3d 244, 250 (4th Cir. 1993) (stating that statute of limitations "defense may be raised under Rule 12(b)(6), but only

- 27 -

if it clearly appears on the face of the complaint") (citing 5A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1357 (2d ed. 1990)). Because the EEOC charge attached to Plaintiff's complaint shows that it was signed by Plaintiff on January 10, 2022, (Doc. 26-1), and because Plaintiff alleges that the charge was filed January 12, 2022, (Am. Compl. (Doc. 26) ¶ 22; Doc. 26-2), the facts alleged in the complaint and its attachments taken in the light most favorable to the Plaintiff indicate that the EEOC charge was timely filed. Therefore, Plaintiff's claims will not be dismissed on a timeliness basis at this stage.

## V. ANALYSIS

### A. Employment Discrimination and Retaliation in Violation of §§ 1981 and Title VII

"A plaintiff may prove that an employer took action with discriminatory or retaliatory intent through direct evidence or through the burden-shifting framework of McDonnell Douglas Corp. v. Green." Strothers v. City of Laurel, 895 F.3d 317, 327 (4th Cir. 2018). Under the McDonnell Douglas framework, once the plaintiff has made a plausible showing of each element, the claim will survive a motion to dismiss and the burden then shifts to the defendant to provide "some legitimate,

- 28 -

nondiscriminatory reason" for the disparate treatment. <u>McDonnell</u> <u>Douglas</u>, 411 U.S. at 802.

### 1. **<u>Discrimination</u>**

Plaintiff alleges that Individual Defendants[8] "engaged in disparate treatment based on her race, denying Plaintiff the enjoyment of the benefits, privileges, terms, and conditions of her contractual relationship" in violation of § 1981(a). (Am. Compl. (Doc. 26) ¶ 139.) This disparate treatment included minimizing Plaintiff's competence and reducing her capacity to direct her research output "in contrast with the latitude extended to white students," interfering with Plaintiff's research which "lacked the support from her primary academic advisors that was customarily extended to white students," subjecting Plaintiff to "stereotypical assumptions regarding her demeanor and behavior that are tropes regularly associated with pejorative racial views of African-American females," and the fact that "Plaintiff's high levels of academic performance and

---

[8] In her Amended Complaint, Plaintiff alleges disparate treatment and retaliation in violation of § 1981 against all Defendants. (Am. Compl. (Doc. 26) at 19–21.) University Defendants correctly state in their brief that they possess sovereign immunity for § 1981 claims, (University Defs.' Br. (Doc. 30) at 11–16), and Plaintiff "does not contest" University Defendants' motion to dismiss her § 1981 claims against them on this basis, (Mem. Br. in Opp'n to Mot. to Dismiss by Defs. Board of Governors of the University of North Carolina and the University of North Carolina at Chapel Hill ("Pl.'s Resp. to Univ. Defs.") (Doc. 32) at 2.)

achievement were not deemed sufficient conditions to continue her enrollment in the Ph.D[.] program, a contrast with how Defendants measured the qualifications of white students." (Id. ¶ 140.)

Individual Defendants respond that Plaintiff "does not allege that her employment contract was interfered with," (Br. in Supp. of Defs. Shimul Melwani, Sreedhari Desai, and Michael Christian's Mot. to Dismiss Am. Compl. ("Individual Defs.' Br.") (Doc. 28) at 9), and, that, even if the contract was interfered with, Plaintiff fails to allege that any interference was due to race. (Id. at 14.) Individual Defendants also assert they are entitled to qualified immunity. (Id. at 24.) University Defendants argue that Plaintiff "has not alleged that her race was a motivating factor in the academic decision to transition her to a master's program," her "job performance was unsatisfactory," and she "has not alleged that her race actually played a role in [UNC-CH's] decisionmaking process and had a determinative influence on the outcome." (Univ. Defs.' Br. (Doc. 30) at 23-25. (internal quotations omitted)

Title VII and 42 U.S.C. § 1981 each prohibit employment discrimination on the basis of race. 42 U.S.C. § 2000e-2(a)(1); 42 U.S.C. § 1981. A race-based employment discrimination claim must assert that the plaintiff "belongs to a racial minority"

- 30 -

and was either not hired, fired, or suffered some adverse employment action due to her race. McDonnell Douglas, 411 U.S. at 802; see also Thompson v. Potomac Elec. Power Co., 312 F.3d 645, 649 n.1 (4th Cir. 2002) (stating that the legal standard is the same under both statutes); Jane v. Bowman Gray Sch. of Med.-N.C. Baptist Hosp., 211 F. Supp. 2d 678, 690 (M.D.N.C. 2002) ("Causes of action for discrimination under Title VI and Title VII of the Civil Rights Act and 42 U.S.C. § 1981 are all appropriately analyzed under the elements of a Title VII claim.").

Employment discrimination claims ordinarily deal with "ultimate employment decisions" — the employer's decision to hire, fire, promote, or demote an employee. Page v. Bolger, 645 F.2d 227, 233 (4th Cir. 1981). However, Title VII liability also extends to any "adverse employment action" that had "some significant detrimental effect on [the employee]." Boone v. Goldin, 178 F.3d 253, 256 (4th Cir. 1999). Adverse employment actions include any "acts or harassment [that] adversely [affected] 'the terms, conditions, or benefits' of the plaintiff's employment." Von Gunten v. Maryland, 243 F.3d 858, 865 (4th Cir. 2001) (quoting Munday v. Waste Mgmt. of N. Am., Inc., 126 F.3d 239, 243 (4th Cir. 1997)), abrogated on other

grounds by Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 62, 66-68 (2006).

"To establish a prima facie disparate treatment case under both Title VII and 42 U.S.C. § 1981, a plaintiff must show (1) [her] membership in a protected class; (2) [her] satisfactory job performance; (3) an adverse employment action; and (4) similarly situated employees outside the protected class who received more favorable treatment." Tabb v. Bd. of Educ. of Durham Pub. Schs., 29 F.4th 148, 157 (4th Cir. 2022) (citing Gerner v. Cnty. of Chesterfield, 674 F.3d 264, 266 (4th Cir. 2012)) (emphasis added). "[W]hen a Title VII plaintiff has the 'dual role' of student and employee, the plaintiff must allege an adverse action that relates only to his status as an employee to survive a motion to dismiss." Alberti v. Rector and Visitors of Univ. of Va., 21-cv-14, 2021 WL 5853598, at *4 (W.D. Va. Dec. 9, 2021) (citing Bucklen v. Rensselaer Polytechnic Inst., 166 F. Supp. 2d 721, 725 (N.D.N.Y. 2001)).

At the motion to dismiss stage, Plaintiff's allegations must also show that discrimination is a more likely reason for disparate treatment rather than any other "obvious alternative explanation" that is present on the face of the complaint and "justified by . . . nondiscriminatory intent." See Iqbal, 556 U.S. at 682. In other words, "a defendant cannot avoid liability

just by citing some other factor that contributed to its challenged employment decision." Bostock v. Clayton County, Georgia, 590 U.S. ---, 140 S.Ct. 1731, 1739 (2020) (citing Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. 338, XX (2013)) (explaining further that but-for causation can be "a sweeping standard" because the "but-for test directs us to change one thing at a time and see if the outcome changes. If it does, we have found a but-for cause.").

Plaintiff is a Black woman discriminated against on the basis of her race, therefore she is a member of a protected class. (Am. Compl. (Doc. 26) ¶ 1; 42 U.S.C. § 2000e-2(m).) Unfortunately for Plaintiff, she fails to allege facts specifically related to her employment and employment contract sufficient to state claims for discrimination and retaliation under Title VII and Sections 1981.[9] Despite the length and

---

[9] For an example of allegations that do rise to the level of employment discrimination in the context of graduate programs, see Mandsager v. Univ. of N.C. at Greensboro, 269 F. Supp. 2d 662 (M.D.N.C. 2003). In that case, the plaintiff was employed as a teaching assistant while a student in a doctoral program. Id. at 670-71. After filing a complaint of sexual harassment, the plaintiff "was told that she could no longer serve as a teaching assistant," and instead "was offered a position as a graduate assistant with fewer hours and less pay than she had enjoyed as a teaching assistant." Id. at 670-71. Here, according to the amended complaint, Plaintiff was permitted to continue her employment as GRA until she concluded her course of study in the KFBS Master's program with no alleged adverse changes to her hours or benefits. (See Am. Compl. (Doc. 26) ¶ 44.)

density of Plaintiff's complaint, Plaintiff's allegations related to her employment as a Graduate Research Assistant ("GRA") are sparse. Plaintiff states that "[a]s part of her participation in the Ph.D. program, [she] was required to undertake employment as a [GRA] at [KFBS]." (Am. Compl. (Doc. 26) ¶ 40 (emphasis added).) Plaintiff's employment as a GRA required her to be "[a] graduate student, enrolled as a full-time student, and engaged in research activities directly related to [her] program of study under the supervision or in collaboration with a member of the graduate faculty." (Id. ¶ 44.) As to any terms of any alleged GRA employment contract, Plaintiff states only that she received an email regarding her "Fiscal Year 2020-2021 Graduate Research Assistantship." (Id. ¶ 41.) Plaintiff also alleges that she began receiving paychecks from UNC for her GRA employment in August 2020, and that she was compensated "at a rate of $33,333.36 in August 2020, which eventually increased to a rate of $34,444.44 by May of 2022" when she graduated from KFBS with a Master's degree. (Id. ¶¶ 43, 44, 128.) Plaintiff does not allege her employment changed or terminated before she graduated. Plaintiff also does not allege that her employment as a GRA provided her a right or expectation of continued employment to support a finding on an adverse

- 34 -

employment action. Plaintiff offers no facts to support a finding that she was terminated from employment due to her race.

Plaintiff appears to allege that her termination from the Ph.D. Program, which effectively cut short the time she anticipated to be employed as GRA, was an adverse employment action under Title VII and Section 1981. (Id. ¶¶ 138, 139, 156, 157.) However, any alleged expectation of continued employment as a GRA while completing her graduate studies at KFBS, without more pertaining to a particular employment contract, does not rise to the level of an employment contract for purposes of Title VII or Section 1981. See Jane, 211 F. Supp. 2d at 680 (an employment contract existed where "[the plaintiff] transferred to the program . . . pursuant to a contract signed with [the defendant] in 1994 and renewed April 28, 1995"); Whittaker v. Morgan State Univ., No. JKB-09-3135, 2011 WL 4072193, at *4 (D. Md. Sept. 12, 2011) (an employment contract existed where "[the plaintiff] claims a property interest in continued employment emanating from his contract with [the defendant] as set forth in the university's faculty handbook"). See also Nadendla v. WakeMed, 24 F.4th 299, 302 (4th Cir. 2022); Harwani v. Moses H. Cone Memorial Hosp. Operating Corp., No. 21CV522, 2023 WL 2753655, at *2 (M.D.N.C. Feb. 28, 2023). Plaintiff was employed as a GRA because it was required by her participation in a

- 35 -

graduate program,[10] and although Plaintiff's academic track changed from the Ph.D program to the Master's program, Plaintiff alleges no change in her conditions of employment. Nor do Plaintiff's allegations establish her termination of employment occurred because of discrimination in employment rather than her graduation from the Master's program. Based on these facts, Plaintiff does not allege that she suffered an adverse employment action as a result of discrimination by Defendants, therefore her Title VII and 1981 discrimination claims must be dismissed.[11]

## 2. **Retaliation**

Plaintiff alleges that Individual Defendants retaliated against her by terminating her from the Ph.D. program at KFBS, "providing false and misleading negative information regarding Plaintiff's academic performance . . . ; and reporting to other educational institutions a false narrative regarding Plaintiff's academic abilities and collegiality." (Id. ¶ 149.)

---

[10] Plaintiff specifically alleges that a GRA is "a graduate student, enrolled as a full-time student," (Am. Compl. (Doc. 26) ¶ 44), and she alleges that her compensation continued until May 2022, (id.), after she moved from the Ph.D program to the Master's program in July 2021, (id. ¶ 105).

[11] Individual Defendants also argue that qualified immunity prohibits Plaintiff from pursuing § 1981 claims against them in their individual capacities. Because this court finds that Plaintiff fails to state any claims under § 1981, this court declines to make a determination as to Individual Defendants' eligibility for qualified immunity.

University Defendants argue that Plaintiff "does not allege that she complained about race discrimination prior to any alleged retaliatory conduct occurring," and "fails to allege what specific type of discrimination she complained about." (University Defs.' Br. (Doc. 30) at 20.) They also argue that Plaintiff fails to allege that an adverse employment action occurred. (Id. at 21.) Individual Defendants offer the same arguments, (Individual Defs.' Br. (Doc. 28) at 17-19), and add that Plaintiff does not sufficiently allege a causal connection between any reporting of discrimination and any retaliatory conduct, (id. at 19-20).

A plaintiff must allege the following elements to state a prima facie § 1981 or Title VII retaliation claim: (1) she engaged in a protected activity; (2) the employer took an adverse employment action against her; and (3) there was a causal link between the protected activity and the adverse employment action. Boyer-Liberto v. Fontainebleau Corp., 786 F.3d 264, 281 (4th Cir. 2015). Again, "when a Title VII plaintiff has the 'dual role' of student and employee, the plaintiff must allege an adverse action that relates only to his status as an employee to survive a motion to dismiss." Alberti, 2021 WL 5853598, at *4 (citing Bucklen, 166 F. Supp. 2d at 725).

For a § 1981 claim, "a plaintiff bears the burden of showing that race was a but-for cause of [her] injury." Comcast Corp. v. Nat'l Association of African American-Owned Media, 589 U.S. ---, 140 S.Ct. 1009, 1014-15 (2020) (rejecting the plaintiff's argument that "a plaintiff should be able to overcome at least a motion to dismiss if it can allege facts plausibly showing that race was a 'motivating factor' in the defendant's decision"). On the other hand, for a Title VII claim, a plaintiff need only "show[] that discrimination was even a motivating factor in the defendant's challenged employment decision." Comcast, 589 U.S. at ---, 140 S.Ct. at 1017 (citing the Civil Rights Act of 1991 § 107, 105 Stat. 1075).

Proving causation at the pleading stage is "not [] onerous," and retaliation plaintiffs "do not have to show at the prima facie stage that their protected activities were but-for causes of the adverse action." Strothers v. City of Laurel, 895 F.3d 317, 335 (4th Cir. 2018). Still, plaintiffs must allege facts plausibly supporting an inference of causation, a task that may be accomplished by alleging facts that show the employer took an adverse action "soon after becoming aware" of protected activity. Id. at 336 (emphasis added); see also Villa v. CavaMezze Grill, LLC, 858 F.3d 896, 899, 901 (4th Cir. 2017)

- 38 -

(discussing importance of an employer's subjective knowledge since an adverse action must be motivated by a desire to retaliate in order to be actionable); Welton v. Durham Cnty., 17-CV-258, 2018 WL 4656242, at *3 (M.D.N.C. Sept. 27, 2018), aff'd, 781 F. App'x 242 (4th Cir. 2019) (discussing Strothers, 895 F.3d at 335–36).

Additionally, the Fourth Circuit has consistently required that the decisionmaker know of the protected activity at the time the alleged retaliation occurred. See Roberts v. Glenn Indus. Grp., Inc., 998 F.3d 111, 124 (4th Cir. 2021) (quoting Talley v. U.S. Postal Serv., 720 F.2d 505, 508 (8th Cir. 1983)) ("Thus, where a relevant decisionmaker is unaware of any prior complaints, a plaintiff 'cannot establish the necessary causal connection between [his] filing a complaint . . . and [his] termination.'").

Plaintiff alleges that she engaged in a protected activity when she reported her concerns about discrimination in the Program to UNC-CH's EOC office in June 2021. (See Am. Compl. (Doc. 26) ¶¶ 84–89.) However, as discussed above, Plaintiff fails to allege that any adverse employment action occurred because of this activity. She states only that Individual Defendants removed her from the Program and prevented her from enrolling in a comparable program at another institution based

- 39 -

on her reports of racial discrimination. (See id. ¶¶ 149, 163.) These allegations relate only to Plaintiff's status as a student, not her status as an employee. Therefore, because she fails to allege that any adverse employment action occurred as a result of her reporting discrimination to UNC-CH, Plaintiff fails to state a retaliation claim under Title VII or Section 1981, and those claims must be dismissed.

### B.   Academic Discrimination in Violation of Title VI

Plaintiff also alleges that she was discriminated against in violation of Title VI by University Defendants. (Am. Compl. (Doc. 26) ¶ 170.) Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. Title VI includes implied rights of action for both intentional race discrimination and "retaliation against a person because that person complained of race discrimination." Mitchell v. N.C. Div. of Emp. Sec., 76 F. Supp. 3d 620, 625-26 (E.D.N.C. 2014) (collecting cases). Here, Plaintiff asserts a claim of discrimination, but not retaliation, in violation of Title VI. (See Am. Compl. (Doc. 26) ¶¶ 170-71.)

To state a prima facie claim for discrimination under Title VI, a plaintiff must allege that she: (1) is a member of a protected class; (2) was qualified to continue in the educational program; (3) suffered an adverse action; and (4) was treated differently from similarly situated students who were not members of the protected class. McCarter v. Univ. of N. Carolina at Chapel Hill, 20-CV-1050, 2021 WL 4482983, at *10 (M.D.N.C. Sept. 30, 2021) (citing Elliott v. Del. St. Univ., 879 F. Supp. 2d 438, 443 (D. Del. 2012)); see also Sanders v. Tikras Tech. Sols. Corp., 725 F. App'x 228, 230 (4th Cir. 2018). "An adverse action is a 'significant change' in status or benefits." McCarter, 2021 WL 4482983,at *11 (citing Hoyle v. Freightliner, LLC, 650 F.3d 321, 337 (4th Cir. 2011)) (explaining that refusal to graduate a student on time, removing a student from a longstanding research project, and blocking a student's work from publication are adverse actions); see also Maisha v. Univ. of N. Carolina, 12-CV-371, 2015 WL 277747, at *3 (M.D.N.C. Jan. 22, 2015), affirmed 641 F. App'x 246 (4th Cir. 2016) (indicating that "dismiss[al] from the program despite . . . qualifications" is an adverse action).

When evaluating whether a plaintiff has alleged that she was treated differently from similarly situated students who were not members of the protected class, "evidentiary

determinations regarding whether the comparators' features are
sufficiently similar to constitute appropriate comparisons
generally should not be made at this point. . . . The similarly
situated analysis typically occurs in the context of
establishing a prima facie case of discrimination, not at the
12(b)(6) stage." Woods v. City of Greensboro, 855 F.3d 639, 650–
51 (4th Cir. 2017) (citing Haywood v. Locke, 387 F. App'x 355,
358–59 (4th Cir. 2010)). However, a plaintiff must allege more
than "just the sort of labels, conclusions, recitations of a
claims' elements and naked assertions devoid of further factual
enhancement that the Supreme Court (and our Court) have held
will not suffice to meet the Rule 8 standard." Nadendla, 24
F.4th at 306 (cleaned up) (citing ACA Fin. Guar. Corp. v. City
of Buena Vista, 917 F.3d 206, 211 (4th Cir. 2019); Iqbal, 556
U.S.at 678).

     As a Black woman, Plaintiff is a member of a protected
class. (Am. Compl. (Doc. 26) ¶ 1; 42 U.S.C. § 2000e-2(m).)
Plaintiff also sufficiently alleges that she was qualified to
continue in the Program despite her dismissal. Plaintiff alleges
that she participated in three different research projects under
the direction of Individual Defendants, (see Am. Compl. (Doc.
26) ¶¶ 57, 62, 73-74), and that, despite not seeing those
projects through to fruition during her time in the Program,

this was due to differences of opinion as to the various directions of the projects, rather than Plaintiff's skill as a researcher. (See, e.g. id. ¶ 60 ("the subject matter of the article was inconsistent with her own research objectives and . . . she did not wish to align her professional brand with a narrative that she felt was at odds with the realities of the African-American experience").) In fact, Plaintiff's research completed after her removal from the Program was presented at the 2022 Academy of Management conference, indicating the sufficiency of Plaintiff's capabilities as a Graduate Research Assistant. (Id. ¶ 96.) Further, the "student handbook's prerequisite for continued enrollment requires that students pass their required courses," and Plaintiff passed all of the classes she took during the 2020-2021 academic year. (Id. ¶¶ 93-94.) Therefore, because Plaintiff alleges that she fulfilled the requirements for continued enrollment by passing her classes, Plaintiff sufficiently alleges that she was qualified to continue in the Program.

Plaintiff also alleges that she suffered an adverse action when she was removed from the Program despite being told that "her academic standing and research performance met the program's standards." (Id. ¶¶ 4, 94, 95.) She asserts that her removal from the Program was instead based on "a double standard

- 43 -

motivated by a combination of her race and gender," and that
"the vague reasons cited for UNC's dissatisfaction with
[Plaintiff] are a thinly veiled veneer for entrenched
stereotypes about individuals who are Black and Female." (Id.
¶¶ 1, 4.) In support of these generalizations, Plaintiff alleges
that she was "marginalize[d]" at the outset of her time in the
Program when Christian publicly insinuated that Plaintiff, the
only Black person in her class, was "in unique need of advice
about overcoming a sense of 'not belonging,'" and when KFBS
failed to include her photo in its candidate portfolio. (Id. ¶¶
46, 47, 48.)

As University Defendants correctly argue, however, the
remainder of Plaintiff's race-related allegations pertain to the
race of others, rather than Plaintiff's own race. (Individual
Defs.' Br. (Doc. 28) at 14–16; Univ. Defs.' Br. (Doc. 30) at
25). These allegations include Christian telling Plaintiff "we
need someone Black" to participate in their code-switching
project "regardless of [that person's] credentials," Christian
telling Plaintiff that "he could never sanction [a Black]
academic from Howard joining a research project without
obtaining direct approval from the Chair of the department,"
Desai inquiring whether Plaintiff sought of connection with
Bermiss "because 'he is Black,'" and Desai insisting that Black

- 44 -

survey participants be compensated from a $45 budget. (Am. Compl. (Doc. 26) ¶¶ 63, 64, 72, 75-78.) Even so, Plaintiff's allegations that Christian "diminished [Plaintiff] in front of her White colleagues" and that KFBS "failed to include a photo of [Plaintiff], its only black PHD candidate, in its portfolio of candidates," when considered as part of the larger factual context, are sufficient at this stage to infer that her ultimate removal from the Program was motivated by racial discrimination. (Id. ¶¶ 45-47.)

Finally, Plaintiff must allege that she was treated differently from similarly-situated Program students who are not Black. In her complaint, Plaintiff compares herself to three other Ph.D. students in the Program who were each "allowed to research and work on projects on issues they had significant interests in and could personally relate or their cultural identity without any meaningful pushback or restrictions." (See Am. Compl. (Doc. 26) ¶ 122.) Specifically, she describes a White female student who "was given latitude to work a project prioritizing women's issues," a student, whose race Plaintiff does not identify, who "had a history of dealing with mental health issues [and] was allowed to work on projects dealing with mental health issues," and a student, whose race Plaintiff does not identify, "whose family immigrated to the United States,

[and] was allowed to work on projects related to immigration."
(Id.)

Plaintiff does not allege whether the mental health issues student and the student whose family immigrated to the United States were outside of her protected class or are otherwise appropriate comparators.[12] However, Plaintiff's allegation that a White female student was given latitude to direct her research on topics of her choosing which Plaintiff, the only Black female student in the Program, was not, is sufficient at this stage to allege that Plaintiff was treated differently from other similarly situated students outside her protected class. Therefore, because Plaintiff alleges that she was qualified to continue the Program, suffered an adverse action when she was removed from the Program, and was treated differently than a similarly situated White female student, University Defendants' motion to dismiss Plaintiff's Title VI discrimination claim is denied.

C. **Discrimination in Violation of the Rehabilitation Act, 29 U.S.C. § 794**

---

[12] Although Plaintiff alleges she was the only Black woman in the program in the 2020-2021 academic year, (Am. Compl. (Doc. 26) ¶ 23), that allegation is not sufficient to permit an inference as to the race or sex of the otherwise unidentified "students."

In her amended complaint, Plaintiff alleges that University Defendants "retaliated against Plaintiff for exercising her statutory rights under the Rehabilitation Act by subjecting her to negative performance evaluations based partly on her requests for reasonable scheduling accommodations related to her disability and by treating said extensions as a basis for terminating her from the Ph.D. program." (Am. Compl. (Doc. 26) ¶ 177.) University Defendants argue that Plaintiff fails to state a claim under the Rehabilitation Act because Plaintiff "has not alleged that she was qualified for the benefit or that she was discriminated against solely based on her disability." (Univ. Defs.' Br. (Doc. 30) at 29.) In her response, Plaintiff asserts that she "does not contest" University Defendants' motion to dismiss her Rehabilitation Act claim. (Pl.'s Resp. to Univ. Defs. (Doc. 32) at 2.) Thus, University Defendants' motion to dismiss, (Doc. 29), is granted as to Plaintiff's Rehabilitation Act claim. See Kinetic Concepts, Inc. v. Convatec Inc., 08CV00918, 2010 WL 1667285, at *6-9 (M.D.N.C. Apr. 23, 2010) (explaining that a party concedes an opponent's argument by failing to address it in their response, and collecting cases in support).

D. **Wrongful Discharge in Violation of NC Public Policy as stated in N.C. Gen. Stat. § 143-422.2(a)**

Plaintiff alleges that University Defendants "violated the public policy of North Carolina by terminating Plaintiff for engaging in protected activity by making internal complaints of race discrimination." (Am. Compl. (Doc. 26) ¶ 181.) Plaintiff specifically points to North Carolina public policy as codified by the North Carolina Equal Employment Practice Act, which states that "[i]t is the public policy of [North Carolina] to protect and safeguard the right and opportunity of all persons to seek, obtain and hold employment without discrimination or abridgement on account of race . . . or handicap by employers who regularly employ 15 or more employees." N.C. Gen. Stat. § 143-422.2(a); see Am. Compl. (Doc. 26) § 180.

University Defendants argue that "there is no private right of action for wrongful discharge under section 143-422.2 of the North Carolina General Statutes. And, even if [Plaintiff] is asserting a common-law claim for wrongful discharge, it is barred by sovereign immunity." (Univ. Defs.' Br. (Doc. 30) at 9, 14-16.) Plaintiff states in her response that she "does not contest" University Defendants' motion to dismiss her wrongful discharge claim, (Pl.'s Resp. to Univ. Defs. (Doc. 32) at 2), therefore that claim will be dismissed.

E.    **Violation of Article 1, Section 19 of the NC State Constitution**

Plaintiff alleges that University Defendants "prevented Plaintiff from being able to pursue her chosen profession and other employment, without unreasonable actions and interference, and based on the restrictions imposed by" University Defendants in violation of Section 1, Article I of the North Carolina Constitution. (Am. Compl. (Doc. 26) ¶ 185.) Plaintiff further alleges that University Defendants denied Plaintiff "her constitutional right to work in an environment free from harassment, discrimination and retaliation pursuant to and guaranteed by Article I, Section 19 of the North Carolina Constitution." (Id. ¶ 189.) University Defendants argue that they are state actors and are therefore entitled to Eleventh Amendment immunity for Plaintiff's North Carolina Constitutional claim. (University Defs.' Br. (Doc. 30) at 16.)

The Eleventh Amendment to the Constitution "bars federal courts from exercising jurisdiction over suits against nonconsenting states or state entities." Kadel v. N.C. State Health Plan for Teachers & State Emps, 12 F.4th 422, 428 (4th Cir. 2021). State sovereign immunity bars suit not only against a state, but also against an instrumentality of a state, such as a state agency, often referred to as an "arm of the State." See Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 100, 124 (1984) ("It is clear, of course, that in the absence of consent

a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment."). The University of North Carolina system, and its Board of Governors, are arms of the State. See Huang v. Bd. of Governors of Univ. of N.C., 902 F.2d 1134, 1139 n.6 (4th Cir. 1990) (recognizing the Board of Governors of the University of North Carolina as an alter ego of the State of North Carolina); see also (Am. Compl. (Doc. 26) ¶¶ 14-15 (alleging that UNC-CH is "one of the universities of the North Carolina System")).

"[T]here is no indication that North Carolina has waived its immunity from claims brought under the state constitution generally or under Article I, Section 19 specifically." Maisha v. Univ. of N.C., 12-cv-371, 2013 WL 1232947, at *3 (M.D.N.C. Mar. 27, 2013), aff'd, 641 F. App'x 276 (4th Cir. 2016). Accordingly, Plaintiff's North Carolina constitutional claim against University Defendants must be dismissed.

### F.   Tortious Interference with Contractual Relationships

Plaintiff alleges that Individual Defendants "interfered with Plaintiff's contractual relationship [with University Defendants] by providing false and misleading information about her academic performance and collegiality during her academic review process, for the express purpose of terminating Plaintiff's contractual relationship" with University

- 50 -

Defendants. (Am. Compl. (Doc. 26) ¶ 201.) Individual Defendants
argue that Plaintiff fails to allege a claim for tortious
interference with contract, (Individual Defs.' Br. (Doc. 28) at
27), and Plaintiff withdraws this claim in her response, (Mem.
Br. in Opp'n to Mot. to Dismiss by Defs. Shimul Melwani,
Sreedhari Desai, and Michael Christian ("Pl.'s Resp. to
Individual Defs.") (Doc. 31) at 2). Therefore, Individual
Defendants' motion to dismiss is granted as to Plaintiff's
tortious interference with contract claim.

G.    **Interference in Violation of the ADA, 42 U.S.C. §**
      **12203(b)**

Finally, Plaintiff alleges "failure to accommodate" in
violation of "the Americans with Disabilities act 42 U.S.C.
§ 12112." (Am. Compl. (Doc. 26) ¶ 212.) She further alleges that
University Defendants "retaliated against Plaintiff when they
removed her from the program due to her request for reasonable
accommodation" for her PTSD. (Id. ¶ 213.) However, Plaintiff
clarifies in her response that although "Count X does not frame
the allegation clearly or accurately identify the relevant
statutory provision within the ADA[,] . . . the factual elements
of a plausible interference theory are described." (Pl.'s Resp.
to Univ. Defs. (Doc. 32) at 17-18.) Because the parties'
briefing focuses on a claim for interference, rather than

- 51 -

failure to accommodate or retaliation, (see Univ. Defs.' Br. (Doc. 30) at 27–29; Pl.'s Resp. to Univ. Defs. (Doc. 32) at 17–19; Reply Br. in Supp. of University Defs.' Mot. to Dismiss ("Univ. Defs.' Reply") (Doc. 33) at 15–16), this court will consider Count X to be an interference claim under 42 U.S.C. § 12203(b).

The Americans with Disabilities Act makes it unlawful to "coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, . . . any right granted or protected by this chapter." 42 U.S.C. § 12203(b)

As both parties acknowledge, "[i]nterference claims under the ADA are relatively rare, as evidenced by the dearth of appellate cases outlining its elements." Sowers v. Bassett Furniture Industries, Inc., 19cv00039, 2021 WL 276169, at *9 (W.D. Va. Jan. 27, 2021). Courts in this Circuit routinely refer to Seventh Circuit precedent establishing the elements of a § 12203(b) interference claim, and this court will follow suit. See id.; Pitts-Brown v. Renal Treatment Ctrs.-Mid Atl., Inc., 21-cv-232, 2022 WL 16951329, at *8 (E.D. Va. Nov. 15, 2022); Patel v. Credence Mgmt. Sols., 120-cv-427, 2021 WL 1439675, at *10 (E.D. Va. Mar. 15, 2021); Kelly v. Town of Abingdon, 437 F. Supp. 3d 517, 528 (W.D. Va. 2020).

To state a claim for ADA interference, a plaintiff must show:

> (1) she is engaged in activity statutorily protected by the ADA; (2) she was engaged in, or aided or encouraged others in, the exercise or enjoyment of ADA protected rights; (3) the defendants coerced, threatened, intimidated, or interfered on account of her protected activity; and (4) the defendants were motivated by an intent to discriminate.

Kelly, 437 F. Supp. 3d at 528 (quoting Frakes v. Peoria Sch. Dist. No. 150, 872 F.3d 545, 550–51 (7th Cir. 2017)).

Formal complaints of discrimination or requests for an accommodation are statutorily protected activities. Patel, 2021 WL 1439675, at *10. "However, where the protected activity is a request for an accommodation, that accommodation must be connected to the disability. Id. (citing Garrett v. Cape Fox Facilities Servs., 19-cv-00579, 2020 WL 265869, at *9 (E.D. Va. Jan. 17, 2020)); see also Frakes, 872 F.3d at 551 ("Protected activities are those statutorily protected under the ADA, including opposing or complaining about discrimination based on disability.").

Plaintiff alleges that Defendants "used Plaintiff's requests for an accommodation as a reason to remove her from the program," (Am. Compl. (Doc. 26) ¶ 209), and that "citing [Plaintiff's] accommodations as a negative element in a performance evaluation" constitutes impermissible interference

- 53 -

with Plaintiff's rights protected by the ADA, (Pl.'s Resp. to Univ. Defs. (Doc. 32) at 18). Regarding her disability, Plaintiff alleges that she had PTSD, she informed both UNC-CH and Individual Defendants of this disability, and that she informed Christan that "she anticipated needing periodic scheduling accommodations including potential extensions on research projects due to the legal and emotional aftermath of her assault and rape." (Am. Compl. (Doc. 26) ¶ 53 (emphasis added).) Plaintiff alleges only one specific instance where such an accommodation was requested, when she "was unable to attend a non-mandatory seminar as she was preparing to attend a court hearing regarding her request for a protective order" from her rapist. (Id. ¶ 56.) She does not allege that this request was denied, but does allege that "[r]ather than acting empathetically, both Melwani and Christian admonished her for not attending the seminar." (Id.) Plaintiff also alleges that, in contrast to what was reported in her annual review, any extensions that she did request "were modest in scope, in the range of hours or a few days." (Id. ¶ 92.)

If Plaintiff's requests for accommodations are the protected activity which forms the basis of her ADA interference claim, the one request for accommodation that she alleges with any specificity is a request that she be excused from a seminar

in order to prepare to attend a court hearing related to her legal proceedings against the person who sexually assaulted her. (Id. ¶ 56.) Though they "admonished" her for her failure to attend the seminar, Plaintiff does not allege that Defendants failed to grant this request. (Id.) Further, Plaintiff does not allege that this exchange was motivated by any intent to discriminate against her on the basis of her PTSD, and the reason for her request itself does not appear to be related to her disability. As for Plaintiff's assertion that her requests for disability accommodation impermissibly served as a basis for her removal from the Program, (id. ¶ 209), she does not allege facts from which this court can reasonably infer that Defendants intentionally discriminated against her on the basis of her disability when removing her from the Ph.D. program and curtailing her employment as a GRA. Accordingly, Plaintiff's ADA interference claim must be dismissed.

## VI. **CONCLUSION**

In summary, Plaintiff withdraws her 42 U.S.C. §§ 1981 and 1983 claim (Counts I and II) against University Defendants, withdraws her claim under the Rehabilitation Act (Count VI), and withdraws her claim for wrongful discharge (Count VII). Additionally, Plaintiff withdraws her claim of tortious interference (Count IX).

Plaintiff fails to allege facts sufficient to state a claim for disparate treatment or retaliation under 42 U.S.C. § 1981 against Individual Defendants (Counts I and II). Plaintiff fails to sufficiently allege a claim under Title VII (Counts III and IV). Plaintiff also fails to allege an ADA interference claim (Count X). Plaintiff sufficiently alleges a claim against University Defendants under Title VI.

In summary, Plaintiff alleges facts sufficient to state a claim for disparate treatment and retaliation under 42 U.S.C. § 1981 and Title VII against Individual and University Defendants. She fails to state a claim against University Defendants for violation of the North Carolina Constitution and for interference in violation of the ADA, and withdraws her claims under the Rehabilitation Act, North Carolina public policy, and common law tortious interference with contract.

**IT IS THEREFORE ORDERED** that the Individual Defendants' Motion to Dismiss, (Doc. 27), is **GRANTED.**

**IT IS FURTHER ORDERED** that the University Defendants' Motion to Dismiss, (Doc. 29), is **GRANTED IN PART,** and Claims for Relief I, II, III, IV, VI, VII, VIII, and X are **DISMISSED.**

This the 20th day of October, 2023.

_William L. Osteen, Jr._
United States District Judge

- 56 -